# Lee v. Lee.

*Bill in Equity for Settlement of Guardian's Accounts.*

1. *Jurisdiction of equity over infants and their guardians.*—The Chancery Court here, as in England, is the general guardian of all infants within its territorial jurisdiction, and has original, inherent jurisdiction to appoint guardians for them, and to remove their guardians, no matter how or by whom appointed, whenever the interest of the infant requires such removal; and this jurisdiction is not affected by the statutory jurisdiction which has been conferred on the Probate Courts. In the exercise of this jurisdiction, the court proceeds upon the theory that guardianship is a trust, and intervenes to protect the interests of the infant, by way of preventive as well as remedial justice—where a loss or injury is threatened, as well as where it has been consummated.

2. *Jurisdiction of equity, as affected by statutory jurisdiction conferred on other courts.*—It is a very general principle, which has been often announced and acted on by this court, that the original jurisdiction of courts of equity is not affected by statutory provisions conferring jurisdiction on other courts, unless the statute contains express words of exclusion, or manifests a clear intention that it shall so operate; but, in such cases, the jurisdiction of equity is concurrent with that of the court on which the statutory jurisdiction is conferred, and if the latter first acquires jurisdiction of any particular case, some special equity must be shown to justify the interposition of the former.

3. *Duty and liability of guardian in lending out ward's money.*—It is the statutory duty of a guardian (Rev. Code, § 2426), as it was his duty in the absence of any statute, to lend out the moneys of his ward, and to require good security in making loans; and for moneys loaned without security, or on security which he knows, or has good reason to believe, is insufficient, he is an insurer against loss, and is absolutely liable, without regard to the credit or solvency of the borrower at the time of the loan.

4. *When infant may come into equity, against guardian and his sureties.*—If letters of guardianship on the estate of several infants are procured from the Probate Court, under an agreement between the guardian and his sureties on his official bond that he will lend the infants' moneys, without security, to a corporation of which the sureties are officers, and which is at that time greatly embarrassed in its pecuniary affairs; and, pursuant to this agreement, the moneys are thus loaned to the corporation, which soon afterwards becomes insolvent, its assets being placed in the hands of a receiver; a bill may be filed in the name and for the benefit of the infants, against the guardian and his sureties, to compel an account, and the payment of the money into court, although it is not shown that the guardian's bond is insufficient; and under such a bill, the court may compel the guardian to account, require the payment of the money into court, appoint a receiver or guardian to take charge of it, under the supervision of the court, investing or lending it out, and applying the income to the maintenance and education of the infants.

5. *Multifariousness.*—A bill in equity, filed by several infants against their guardian, to compel an account and settlement, and the payment of the money

into court, is not multifarious, because it joins as defendants the sureties on two different official bonds, given by the guardian on two successive appointments by the same court. If, on the resignation and settlement of the guardian under his first appointment, his re-appointment on the same day, and the execution of a new bond, the liability of the sureties on the first bond was discharged, the bill shows no cause of equitable relief against them, and, therefore, is not multifarious; and if, on the other hand, it alleges that the resignation, settlement and re-appointment were fictitious and collusive—being effected for the purpose of procuring the discharge of one of the sureties on the first bond, who had actively participated in procuring from the guardian, without security, a loan of the infants' money to an insolvent corporation, of which some of the sureties were officers; and for the further purpose of enabling such corporation to still retain the money without security—it shows a case for equitable relief against all the sureties, and all are properly joined as defendants.

6. *Judgments and decrees; how affected by fraud and collusion.*—It is an indispensable element in the validity of every judicial proceeding, that it should be free from collusion : a judgment or decree, obtained by fraud, cannot avail anything, for or against the parties affected by it, either in the prosecution of a claim, or the defense of a right.

APPEAL from the Chancery Court of Perry.

Heard before the Hon. CHARLES TURNER.

The bill in this case was filed on the 22d December, 1875, by John Lee, Edgar Lee, and Mary Lee, the two latter being infants, and suing by the said John Lee as their next friend, against their guardian, John H. Lee, and the several sureties on his official bonds as such guardian, to-wit: F. A. Bates, W. B. Modawell, J. H. Speed, J. W. Crenshaw, A. B. Lane, W. M. Brooks, W. C. Wyatt, Harriet Johnston, W. R. Brown, A. M. Fowlkes, Carlos Reese, J. B. Cocke, and Amzi Godden ; and sought a settlement of the guardian's accounts, and the payment into court of the money found due to the complainants on the statement of the account. The complainants, together with David Lee, an infant of tender years, who died on the 13th November, 1872, were the only children and heirs-at-law of John Lee, late of Perry county, who there died, intestate, during the year 1870, being possessed of a large estate, real and personal ; and letters of administration on his estate were duly granted, soon after his death, to Porter King. On the 27th February, 1872, letters of guardianship on the estate of the said four children were granted by the Probate Court of Perry to John H. Lee, one of the defendants ; and he thereupon gave bond as such guardian, in the penal sum of one hundred thousand dollars, with the defendants, F. A. Bates, W. B. Modawell, J. W. Crenshaw, J. H. Speed, A. B. Lane, W. C. Wyatt, and W. M. Brooks, as his sureties. On the 5th March, 1872, the said guardian received from the administrator of John Lee's estate the sum of $7,008 in gold, and $23,792 in currency, belonging to the estates of his said wards ; and on the 25th January, 1873, he returned an inventory to the court, under oath, acknowl-

edging his receipt of these moneys on that day. On the 28th January, 1873, he filed with the court his accounts and vouchers for a final settlement of his guardianship, showing the following balances in his hands, due to his wards: To John Lee, $1,844.86 in gold, and $4,958.09 in currency; to David Lee, then deceased, $1,844.86 in gold, and $5,319.35 in currency; to Mary Lee, the same amount in gold, and $4,287.48 in currency : and to Edgar Lee, the same amount in gold, and $5,652.45 in currency. The court thereupon appointed the 5th March following as the day for the settlement, and ordered three weeks' notice of it to be given. On the 5th March, 1873, the court appointed T. A. Givhan as guardian *ad litem* of the infants, and he accepted the appointment in writing, certifying on the accounts as filed that he had examined them, and found them correct, and consented that they be allowed as stated ; and the court thereupon allowed the accounts as stated, and rendered decrees against the guardian, in favor of each of the complainants, for the amounts shown to be due to each of them respectively, including the amount found due to the estate of David Lee. The decree further recites that the guardian has resigned, accepts his resignation, and orders that he be discharged from the further performance of his duties. On the same day, the said John H. Lee again applied for letters of guardianship on the complainants' estates, and letters were again granted to him ; and he thereupon gave another bond, which was accepted by the court, in the penal sum of $60,000, with F. A. Bates, W. C. Wyatt, W. R. Brown, A. B. Lane, W. M. Brooks, W. B. Modawell, J. H. Speed, A. M. Fowlkes, Carlos Reese, J. B. Cocke, Amzi Godden, and Mrs. Harriet Lee (the complainants' mother, who afterwards married again, and was made a defendant to the bill by the name of Harriet Johnston), as his sureties. On the 9th April, 1873, the guardian filed in said court, as an inventory of his wards' estates, a statement, under oath, that he had collected from the Perry Insurance and Trust Company the sum of $7,370.44 in gold, and the further sum of $20,217.17 in currency, being the aggregate amount of the said decrees rendered against him on the 5th March, as above stated, and had again loaned the same to said company for twelve months, at eight per cent. interest, taking the note of the company, with W. B. Modawell and W. R. Brown as sureties for the loan ; and he asked that satisfaction of the decrees might be entered.

The bill alleged, that John H. Lee was insolvent at the time of his first appointment as guardian, and so continued up to the filing of the bill, and was known by his sureties to be insolvent when they signed his bond; that it was understood and

agreed between him and them, at and before the execution of his bond, that he would lend the moneys belonging to his wards to the said Perry Insurance and Trust Company, of which said W. R. Brown was then the president, and F. A. Bates, J. W. Crenshaw, and W. M. Brooks were directors; that on the 5th March, 1872, pursuant to this agreement, he loaned all the moneys which he had received to said insurance company, without taking or requiring any security for the loan; that said company was then greatly embarrassed, and in doubtful circumstances, and its condition was well known to its directors; that on the 28th January, 1873, the said company was in failing circumstances, and unable to pay its debts, and had not repaid any of the money borrowed from said guardian; that said J. W. Crenshaw, knowing these facts, threatened to make application to the Probate Court to be released from liability on said guardian's bond; that thereupon it was planned between said Crenshaw, Brown, Bates, and other officers of said company, and said guardian, that he should settle his accounts, resign his guardianship, make application to be re-appointed, give a new bond, and acknowledge satisfaction of the decree that might be rendered against him; that this plan was contrived for the purpose of releasing said Crenshaw from liability on said guardian's bond, without the payment of any money, and without calling on said corporation for the money, and it was carried into effect and consummated, as shown by the proceedings had in said Probate Court; that said guardian made application for his re-appointment for the purpose of carrying out this agreement, and did not collect any money from said insurance company, as he reported he had done on the 9th April, 1873; that W. B. Modawell and W. R. Brown, whom he reported he had taken as sureties for the new loan, were at that time insolvent; that the insurance company had become insolvent, and had ceased to do business, and its assets had been placed in the hands of a receiver; that the guardian had thereby become unable to furnish the infant complainants with the means of subsistence and education, and their funds were in danger of being entirely lost; and they insisted that all the sureties on the two bonds were liable to them for the moneys which their guardian had received. The bill prayed that an account might be stated, to ascertain the amount due to the complainants respectively from the said guardian; that he and his sureties might be required to pay to the adult complainant, John Lee, the amount ascertained to be due to him; that the amounts ascertained to be due to the infants respectively might be paid over to a receiver, or some suitable

person, to be appointed by the court, and applied for their support and maintenance; and for other and further relief.

The chancellor sustained a demurrer to the bill for multifariousness, and his decree is now assigned as error.

PETTUS & DAWSON, with LAWSON & MOORE, for appellants. 1. The bill is not multifarious. The objection of multifariousness is confined to cases where the case of each defendant is entirely separate and distinct in its subject-matter from that of the others; for the case against one defendant may be so entire as to be incapable of prosecution in several suits, and some other defendant may be a necessary party to only a portion of it; in which case, the bill is not multifarious.— *Kennedy v. Kennedy*, 2 Ala. 573; *Dallas County v. Timberlake*, at December term, 1875. In this case, there was a single appointment of a guardian for the estates of four minors jointly, and one joint bond given; the infants' funds were loaned, without security, to an insolvent corporation, while Crenshaw was one of the sureties; and there was no change of the funds after the resignation and settlement of the guardian, which were effected under an agreement which the law will not sanction. There could be but one suit against the guardian, and all the sureties are necessary parties to the bill.

2. The Chancery Court is the general guardian of all infants within its territorial jurisdiction: and it will always interfere to protect their interests, against any misconduct or violation of duty by a guardian, even to the extent of removal when necessary.—2 Kent's Com. 227; 2 Stephens' Com. 344, and cases cited in note; 1 Johns. Ch. 99; 2 Johns. Ch. 439; 1 P. Wms. 700.

W. M. BROOKS, *contra.*—1. The bill asks a settlement of two distinct guardianships, and seeks to hold both sets of sureties liable. The two guardianships are 'as distinct as if granted to different persons. If the sureties on the first bond are still liable, notwithstanding the guardian's resignation and settlement, then the sureties on the second bond are not; and *vice versa*, if the sureties on the second are liable, the sureties on the first are not. In either case, there is manifestly a misjoinder.

2. The sureties on the first bond were discharged, by operation of law, by the settlement, resignation, re-appointment, and execution of the new bond.— *Whitworth's Distributees v. Oliver*, 39 Ala. 286; *Davis v. Davis*, 10 Ala. 359; *Perkins v. Moore*, 16 Ala. 9; *Enicks v. Powell*, 2 Strob. Eq. 196.

3. There is nothing in the allegations of the bill to take

the case out of the operation of these general principles. It does not establish fraud, or even the semblance of fraud, in any of the transactions of the guardian and his sureties. It alleges that he was insolvent, and was known to be so by his sureties when they went on his bond; but it does not allege that his bond is not good and sufficient. If he loaned the moneys of his wards to a corporation which afterwards became insolvent, without requiring security, his bondsmen are liable for any loss that may ensue. There is nothing unlawful in the alleged agreement by which Crenshaw procured his discharge. If he became uneasy, or dissatisfied, he had a right to institute legal proceedings to procure his discharge; and the guardian and other sureties might lawfully consent to his discharge, and effect it through the medium of a judicial proceeding, without engaging in any controversy with him. Parties may lawfully do, without litigation, what the law would compel them to do. If the sureties required that the money should be loaned to the company without security, as the condition on which they signed the bond, the fact only shows that they considered the company solvent, and were willing to be sureties for its solvency.

BRICKELL, C. J.—The Court of Chancery had original, inherent jurisdiction to appoint guardians for infants within its territorial jurisdiction, and to remove them, whenever the interests of the infant may have required it.—2 Story's Eq. §§ 1338, 1339, 1340; *Striplin v. Ware*, 36 Ala. 87. In the absence of statutes conferring the jurisdiction on other tribunals, there is, in the organization of the judicial system of this State, no other court than the Court of Chancery, in which this jurisdiction could reside. At law, during the continuance of the guardianship, the infant can bring no action against the guardian, either of account, or for the recovery of the income, or the *corpus* of his estate.—Reeves' Dom. Rel. 335; *Chapman v. Chapman*, 32 Ala. 106; *Eiland v. Chandler*, 8 Ala. 781. In equity, a different rule prevails. The guardianship, as to the preservation, management and control of the estate of the infant (which alone is involved in the present controversy), is regarded as a trust coupled with an interest, and the court applies to it the general principles on which it proceeds in relation to other trusts.—*People v. Byron*, 3 Johns. Cases, 58. In *Duke of Beaufort v. Berty*, 1 P. W. 704, the lord-chancellor said, in answer to an objection that testamentary guardians should not be interfered with until they had misbehaved, that guardians are but trustees, and though the statute had empowered the father

[Lee v. Lee.]

by will to appoint a guardian for his infant children, such guardians had no greater authority than guardians in socage; that both were trustees, and the court would intervene to prevent as well as to punish misbehavior; and this was " founded on the general power and jurisdiction which the court had over all trusts, and the guardianship was most plainly a trust." In *Eyre v. Countess of Shaftesbury*, 2 P. W. 119, it is said: " The law is particularly favorable to, and careful of an infant's interests; and though the infant himself can not bring an account against the guardian, until his coming of age, yet a third person may bring a bill for account against the guardian, even during the minority of the infant." In *Monell v. Monell*, 5 Johns. Ch. 297, Chancellor KENT said: "It is too plain a proposition to stand in need of authorities (though the counsel for the plaintiff have cited some to the point), that the infant may come into this court, by his next friend, and call his guardian to account, or require him to give better security, if the state of the case shall call for it." In *Lemon v. Hansbarger*, 6 Gratt. 301, it is held, that an infant may, by his next friend, call the acting or any preceding guardian to account.

All the principles on which a court of equity proceeds, in dealing with the relation of guardian and ward, are founded on the theory, that guardianship is a most important and delicate trust. The nature and character of the relation is that of a trust—not of a naked, or dry trust, in which the trustee is a mere repository of a legal title, while the use and enjoyment reside in the *cestui que trust;* but a trust in which, while the trustee is not clothed with the legal title, he has the power of disposition of the personal estate, the exclusive right of possession and management, whether the estate is real or personal, charged with the active duty of applying the income and profits, so far as necessary, to the support and education of the ward, and of investing the moneys of the ward, however derived, and the exclusive right to receive the income and profits, or the principal. It is not material whether the trust is created by the will of the father of the ward, by appointment from the Court of Chancery, or by the appointment of a tribunal clothed by statutes with the jurisdiction. It is not the mode of delegation, but the powers and duties, which impart to it the distinctive character of a trust, and draw it within the jurisdiction of a court of equity. Hence, the general principle, "that a Court of Chancery will not only remove guardians appointed by its own authority, but it will also remove guardians at the common law, and even testamentary or statute guardians, whenever sufficient cause can be shown for such a purpose. In

all such cases, the guardianship is treated as a delegated trust, for the benefit of the infant; and if it is abused, or in danger of abuse, the Court of Chancery will interpose, not only by way of remedial justice, but of preventive justice."— 2 Story's Eq. § 1339; *Ex parte Nicholl,* 1 Johns. Ch. 25; *Ex parte Crumb,* 2 Johns. Ch. 439; *Disbrow v. Henshaw,* 8 Cow. 349; *Matter of Dyer,* 5 Paige, 534; *Wellesly v. Wellesly,* 2 Bligh (N. R.) 128.

Executors and administrators, at law, are the absolute owners of the personal assets; yet, in equity, they are regarded as trustees, clothed with the legal title, and the incidental power of disposition, charged with the duty of collection, preservation, and administration; and though the court is reluctant to disturb their management, or interfere with their administration, yet, if, by a want of diligence, or by positive misconduct, actual loss has resulted, or there is imminent danger of loss, the court, in the exercise of its general jurisdiction over trusts, and to compel their execution, will intervene, take into its own hands the administration, and order the payment of the assets into court, or appoint a receiver to take charge of them.—2 Story's Eq. §§ 836–842. The guardianship is a trust solely for the benefit of the infant—his rights and interests are alone to be considered. The guardian who is diligent, and keeps within the line of his duty and authority, is fully protected; but he can never stand in a relation of antagonism to the ward—he can have no right or interest hostile to that of the ward, and cannot need protection against him. It is the ward who is in a condition of dependence, and who stands in need of the power of the court, for protection against the abuse of the authority committed to the guardian, and has the right to compel a performance of the duties, for the performance of which the guardian is entrusted with authority. On the same principle, on which the court intervenes against executors, administrators, or other trustees, the court must intervene for the protection of the ward, whenever, by the negligence, or the positive misconduct of the guardian, the rights and interests of the ward are in jeopardy, or actual loss has resulted.— Kerr on Receivers, 16–19; High on Receivers, §§ 725–732. The continuance of the relation may interpose impediments to a suit at law; but the relation and its trusts, and the inadequacy of legal remedies to compel the execution of the trusts, are the foundation on which the jurisdiction of a court of equity rests.

The statutes have conferred on the Courts of Probate jurisdiction to appoint guardians for minors; to require bonds with sureties for the faithful performance of their duties; to

exact new or additional bonds and sureties, whenever there may be any exigency for it; to remove guardians for cause; to compel annual and final settlements, and to render final decrees, binding alike on the guardian and his sureties. But the statutes contain no express words, and no indication of a purpose to exclude the jurisdiction of a court of equity as it originally existed, unless such implication can be made from the fact that a similar jurisdiction is conferred on the Court of Probate.

2. It is a very general principle, that a court of equity never, except in obedience to statutory enactment, loses a jurisdiction it has once assumed. The enlargement of the jurisdiction of courts of law, or changes in rules of evidence or pleading, or the recognition or enforcement by them of equitable rights and interests, or the creation of statutory tribunals vested with equitable jurisdiction, does not lessen or impair the jurisdiction in matters originally cognizable and relievable only in that court.—Kerr on Injunctions, 6. The principle underlies numerous decisions of this court, and has been applied more often in suits for an account of the administration, or marshalling and distribution of assets, than in any other class of cases. The statutes have conferred on the Court of Probate large jurisdiction over these subjects. The decisions are uniform, that thereby the original jurisdiction of a court of equity is not impaired—that to the extent of the jurisdiction conferred on the Court of Probate, it is concurrent with that of a court of equity; and the rule obtains, prevailing whenever the jurisdiction at law and in equity is concurrent, that if the Court of Probate first acquires, it retains jurisdiction, unless an intervening equity requires the interposition of a court of equity to do complete justice, or to quiet the litigation.

3. A clear duty of a guardian, defined by statute, is to loan the moneys of the ward, and, in making loans, to require bond and mortgage, or good personal security.—R. C. § 2426. In the absence of a statute, such was his duty; and he is absolutely liable for money loaned without security, or on security he knows is insufficient, or has not good reason for believing sufficient, whatever was the credit, or the solvency of the borrower; liable, because the loan is a breach of trust, a violation of duty.—*Smith v. Smith*, 4 Johns. Ch. 281; *Clay v. Clay*, 3 Metc. (Ky.) 518; *Boyett v. Hurst*, 1 Jones' Eq. (N. C.) 166. If all imputation of bad faith is excluded, and if there should be extraordinary diligence to reclaim the money and save loss, the liability incurred by the first wrongful, illegal act, the original loan, would remain. When, on the credit of the borrower alone, whether an individual, or a

partnership, or a corporation, he hazarded the moneys of the ward, he departed from the line of his authority and duty, and became an insurer against loss to the ward.

4. The bill discloses that the guardian was insolvent at the time of his appointment—that his guardianship was, in fact, but an instrumentality, by which a corporation, in doubtful or failing circumstances, and eventually becoming insolvent, should get possession of the moneys of the wards, without giving security for its payment. Some, if not all his sureties, as guardian, were connected with this corporation; and they became such sureties, on the understanding that the moneys should be loaned without requiring security from it. The assets of the corporation have been put in the hands of a receiver; the moneys cannot now be collected, and the infants cannot realize the interest for maintenance and education. The safety of the funds has been imperilled by the guardian's violation of duty; and the collection of them, in whole or in part, except by an account from the guardian, and a decree against him and his sureties, is uncertain. Whatever may be realized from the corporation, if anything can be, will be only at the termination of a chancery suit. The object of the bill is an account from the guardian, a decree against him and his sureties, the payment to the ward not under the disability of non-age, of the share to which he is entitled, and the payment into court of the shares of the infants, to be managed and controlled for their interest as the court may direct. The bill is not without equity, unless the original jurisdiction of a court of equity over guardianships has been diminished by statute. We do not find that it is diminished, or impaired—it remains, not exclusive, as it would have been, if a similar jurisdiction had not been conferred on the Court of Probate, but concurrent with that jurisdiction; and may be invoked by the ward, suing by a next friend, whenever facts exist requiring its exercise.

Whenever a suit is instituted for the protection of the infant, either in person or estate, the infant becomes a ward of the court, and the court exercises over him and his estate a general supervision and control. In this sense, it is true here, as in England, that the Court of Chancery is the general guardian and protector of all infants within its jurisdiction.—2 Story's Eq. §§ 1351–1352; *Williamson v. Berry*, 8 How. (U. S.) 555; *Matter of Andrews*, 1 John. Ch. 99; *Monell v. Monell*, 5 Johns. Ch. 283; *Ex parte Crumb*, 2 Johns. Ch. 439; *Disbrow v. Henshaw*, 8 Cow. 351; *Matter of Dyer*, 5 Paige, 534; *Wood v. Wood*, Ib. 605; *People v. Wilson*, 22 Barb. 117; *Westbrook v. Comstock*, Walker, (Mich.) 314; *Lynch v. Rotan*, 39 Ill. 14; *Grattan v. Grattan*, 18 Ill. 171;

*McCord v. Ochiltree,* 8 Blackf. 15; *Townsend v. Kendall,* 4 Minn. 412; *Wood v. Wood,* 3 Ala. 756; *Chambers v. Perry,* 17 Ala. 726. Whether, in such case, the court would exercise, to its full extent, the jurisdiction over the person of the infant which the English court exercises, it is needless to inquire, "although," as was said in *Chambers v. Perry, supra,* "it might be difficult to deny them the existence of such powers." The present case requires only the exercise of the jurisdiction inherent in the court, for the protection, preservation, management, control, and proper application of the estate of the infants. The infants becoming, by the institution of the suit, the wards of the court, the court may remove the unfaithful guardian who has abused his trust, though he received his appointment from the Court of Probate.—2 Story's Eq. § 1339. It can compel him to account, decree the payment of the funds into court, appoint a receiver, or a guardian, to take charge of them, and direct, under its supervision, the loan or investment of them, and the application of the income to the maintenance and education of the infants.

Accepting, as we must on demurrer, the allegations of the bill as true, the guardianship commenced in a gross dereliction of duty, the consequences of which have estranged, more and more, the interests of the guardian and ward, until now they are directly hostile. The prominent and controlling purpose has been, not to guard and preserve the rights of the wards, protecting their funds, and managing them productively, but to keep them in the possession of a corporation, to say the least, of doubtful solvency, without security, or on security which was merely nominal. The interest is not collectable, and cannot be applied to the maintenance and education of the infants, or invested so as to increase the principal or capital. Liability of the guardian and his sureties is the only security for indemnity against loss, which the wards now have. The enforcement of this liability, it is not probable, the guardian will not resist; and the consequence of his conduct is to convert him from the relation of protector, into that of adversary to the infants. If he had stood in such a relation originally, he could not have been properly appointed guardian; and now that he has by his misconduct placed himself in that relation, he should be removed.

It is true the bill does not aver that the bond of the guardian is not sufficient in penalty and security to protect the infants against loss from the *devastavit* he has committed; and such averment not being made, it may be, that on demurrer it must be assumed it is ample indemnity against loss or damage. The bond is mere security to the infants, cumulative to

that of the personal responsibility of the guardian, for indemnity against loss from his want of fidelity or diligence. It does not lessen the rights of the infants, nor circumscribe the jurisdiction of the court. A breach of its condition—the wasting or misapplication of the funds of the wards, or the placing them in danger, cannot be justified or excused, because the sureties are solvent, and can answer for any loss or injury. They may be of present ability; but "experience admonishes us," that when the day of reckoning comes, the ability may have vanished with time.—*King v. Calhoun,* 5 Ala. 578. It is not only punitive and compensatory justice, but also preventive justice, which the complainants invoke. The court interferes, not only to correct wrongs which have been done, but to prevent their recurrence. The ability of guardian or surety to answer for unfaithfulness, does not authorize the continuance of the relation of guardian and ward, and of the opportunity to abuse trust and confidence. Nor does it justify continuance of the relation, when the personal interest of guardian and surety is hostile to that of the ward, and inimical to the duty of protection. No man, whether he occupies a fiduciary relation or not, can set up his ability to answer for a wrong, as an excuse or justification for its commission; nor, if he occupies such relation, as a reason for not preventing him from abusing the trust by its commission. It is the abuse of the trust, at last, which the court corrects, or prevents; and it is as grievous, if the trustee is solvent, as if he was insolvent, though in the one case there may be compensation, while none may be expected in the other.

We have considered the objection of multifariousness, the sole ground of demurrer sustained by the chancellor. The theory of the demurrer, in this respect, is, that the bill blends two distinct guardianships, the sureties on two several, distinct bonds having no connection with each other; that on the resignation of the guardian, and the final settlement, the first guardianship terminated, and, on his re-appointment, the execution of a new bond under that appointment, and the acknowledgment of satisfaction of the decrees rendered on final settlement, all liability for the funds of the wards was transferred to the second guardianship, and the liability of the sureties on the first guardianship was extinguished. Admitting the correctness of this theory, the bill is not subject to the objection of multifariousness. It would merely present two demands, one of which is without equity, entitling the complainants to no relief, and the other of equitable cognizance. A demurrer for multifariousness proceeds on the ground, that the bill presents two distinct demands, each of equitable cognizance, and each entitling the complainant to

relief. In the view we feel constrained to take of the case, it is not important to consider this objection.

Whatever may have been the effect of the proceedings by which it is supposed the first guardianship was terminated, and all liability transferred to the second guardianship, if they had been fair—if they were what they seem to be—taking the averments of the bill as true, they are infected by fraud, and cannot be allowed to operate an extinguishment of the liability of the sureties on the first bond. The resignation was a *quasi* judicial proceeding, not operative until the court recognized and accepted it. An entry of record, the act of the court, disclosing that it was in writing, and of file in the court, was necessary to give it effect.—*Gayle v. Elliott*, 10 Ala. 264. The final settlement is strictly a judicial proceeding, having all the elements of a suit at law or in equity; and the decree rendered has the force, finality, and dignity of a judgment at law, or a decree in equity. It ascertains and settles conclusively the extent of the liability of the guardian and the rights of the ward. The re-appointment of the guardian, and the taking from him bond for the faithful performance of his duties, were also judicial acts. How far a court of equity has jurisdiction to vacate judgments of a court of law, or the decrees or judgments of a court of concurrent jurisdiction, because of fraud in obtaining them, is not the question the case presents. It may prevent the parties guilty of the fraud from taking any benefit under the judgment or decree, either as a ground of relief or defense, and leave its vacation to the tribunal pronouncing it. In *Earl of Bandon v. Becher*, 3 Clark & Fin. 507, it was said by Lord Brougham that, while it was true, the judgment or decree of a court of competent jurisdiction could not be questioned in another court of co-ordinate jurisdiction, but, if brought into dispute at all, should be brought into dispute in the court where it was originally pronounced, the principle was subject to qualification. If the decree or judgment had been obtained by fraud, it could not avail anything for or against the parties affected by it, to the prosecution of a claim, or to the defense of a right. It is an indispensable element of the validity of every judicial proceeding, that it be free from collusion. The argument of the solicitor-general, in the *Duchess of Kingston's case*, was adopted by Lord Brougham, in the case referred to, as concisely expressing the result of *all the authorities*: "A sentence is a judicial determination of a cause agitated between real parties, upon which a real interest has been settled; in order to make a sentence, there must be a real interest, a real argument, a real prosecution, a real defense, a real decision. Of all these

[Lee v. Lee.]

requisites, not one takes place in the case of a fraudulent and collusive suit ; there is no judge, but a person, invested with the ensigns of a judicial office, is misemployed in listening to a fictitious cause proposed to him ; there is no party litigating ; there is no party defendant; no real interest brought into question." Lord Chief-Justice DeGrey, in delivering the opinion of the court, said : "The judgment is not impeachable from within, the court having jurisdiction. It cannot be shown the court was mistaken—it may be shown it was misled. Fraud is an extrinsic, collateral act, which vitiates the most solemn proceedings of a court of justice."—2 Smith Lead. Cases, 578.

Accepting as true the allegations of the bill, there was nothing real in all the machinery of final settlement, resignation, and re-appointment of the guardian. It was fictitious, fraudulent, and collusive ; contrived for the purpose of quieting an alarmed surety, who was seeking to escape from liability for a *devastavit*, in which he had not only participated, but made its commission the condition on which he entered into the obligation of suretyship. The character of the transaction was not disclosed, and it was intended it should not be known to the court. If it had been made known that the purpose was not an actual renunciation of the office of guardian—that the final settlement was not intended as a final ascertainment of the guardian's liability, the rendition of a final decree, conclusive on him and his sureties, and on which execution could issue against them, can it be believed the court would have been misemployed in entering on its records these proceedings, having nothing substantial about them, which were but forms pursued for a purpose the law does not intend shall be accomplished by them ? The resignation and re-appointment were on the same day. What interval of time elapsed between them, is not disclosed, and in all probability was inappreciable. It was the fraction of a day, of which the law takes no notice. The resignation and re-appointment were concurrent in point of time, and it was essential they should be to consummate the purpose intended —that of a guardianship continuing, so that the funds of the infants would remain in the precarious condition in which they had been placed, and the guardian not made to account for them, yet terminating so far as to release the alarmed surety from liability. The proceedings were all concerted, and intended as an evasion of the remedy prescribed by statute for the surety of a guardian to obtain a release—an application to the court, stating that he is unwilling to remain longer bound.—Rev. Code, § 2418. If this course had been pursued by the surety, there would have been a real

controversy, on which the court would pronounce judgment. There would have been contending parties—the complaining surety would have been the actor, and the guardian the defendant. The vigilance of the court would have been awakened, and the inquiry made, why, in but little more than twelve months after entering into the obligation of suretyship, the surety was *unwilling to remain longer bound?* what conduct of the guardian, or what fact, had occurred, to produce the unwillingness? why had confidence in the guardian been lost or impaired? The inquiry would probably have led to the disclosure of the facts, that he and others had invited the guardian into a gross breach of trust, which would involve them in liability from which he was endeavoring to escape. The removal of the guardian, when the facts were disclosed, would have been the legal result.—Rev. Code, § 2447. The liability of the surety, to which in good conscience he ought to respond, having participated actively in the wrong from which it results, would have remained. The final settlement, the resignation and re-appointment were an evasion of the statutory method of obtaining a release from the bond, or a termination of the guardianship; and yet that was their only purpose. The law can no more tolerate evasions, than it can open violations of its provisions. Tainted with fraud and collusion, a court of equity cannot permit these proceedings to be set up in bar to the relief prayed by the bill, against the sureties on the first bond. They are bound to the same extent they would have been if these fraudulent and collusive proceedings had not been introduced on the records of the Court of Probate.

The fraud was practiced on the infants and the court, not on the sureties to the second bond. It operated no injury to them, and consequently furnishes to them no just cause of complaint.—*Comstock v. Ames*, 42 N. Y. 359. The execution of the second bond operated to continue the guardian in office and authority, and is founded on a sufficient consideration.—*Alston v. Alston*, 34 Ala. 15. What relations subsist between the sureties on the second bond and the sureties on the first bond, it is not necessary to inquire. As against the guardian, the suit is entire, incapable of separation; and the sureties on both bonds have connected themselves with him, and are proper parties.—1 Dan. Ch. Pr. 337.

The demurrer to the bill was not well taken; and the decree of the chancellor, sustaining the demurrer for multifariousness, must be reversed, and a decree here rendered, overruling, in all things, the several demurrers, and remanding the cause.