# Holt *v.* Agnew *et al.*

*Bill in Equity by Married Woman, who had been Relieved of Disabilities of Coverture, to set aside Transfer of Insurance Policy made by her in Payment of Husband's Debt.*

1. *Constitutional provisions read and construed in reference to common-law.* Constitutional provisions which were intended to remedy defects in the common law, must be read and construed in the light of that law; and when words of definite signification at common law are used in such provisions, and there is no intention manifested that they shall be taken in a different sense, they are employed in their known and defined meaning.

2. *Same; what the provisions regarding separate estates were intended to accomplish.*—The common law powers of the husband over the wife's property, had been abrogated long before the enactment of the constitutional provisions, (Art. X, § 6) declaring that "all property of every female shall be and remain her separate estate, and shall not be liable to the debts of the husband," &c., which were intended to prevent their restoration, and those provisions do not refer to the voluntary payment by the wife of the husband's debts, which depends for validity on her capacity as owner of the estate, but to the liability which arose as an incident of ownership from the exercise by the husband of his common law powers over the estate.

3. *Same; create equitable separate estate in married women.*—Whenever an estate was limited to the sole and separate use of a married woman, before the enactment of the statutes, or these constitutional provisions, she was regarded in a court of equity as a *feme sole,* and could sell or charge the property just as if she were *sui juris,* and the constitutional provisions only create an equitable separate estate, over which she could exercise the same control, if the statute did not intervene and attach to it peculiar properties and incidents.

4. *Statutory separate estate; power of wife over, when husband is trustee, and when he has been removed.*—The wife cannot charge or alienate her statutory estate to pay her husband's debt, nor mortgage it to pay any debt or demand whatever. She may sell and convey it, but the husband must join in the conveyance, which must be witnessed or acknowledged. If, however, the husband who, under the law, manages her property as trustee, becomes unfit to control it, a court of equity will remove him, and the wife then becomes invested with all the power over the property which she would have as a *feme sole.*

5. *Wife; may be relieved of the disabilities of coverture as to separate estate, and may then pay husband's debts.*—The wife may, on application to the Chancellor, be relieved, under the statutes, from the disabilities of coverture, as to her separate property, and her power to buy and sell then becomes unlimited,

[Holt v. Agnew et al.]

and there is no reason for excluding the power to make mortgages, or transfers of any kind, to secure the debts of her husband.

6. *Injudicious transfers of property not interfered with by courts.*—The owner of property has the right to dispose of it at will, and courts will not assume to control his disposition of it, because they are injudicious, or unwise; but free and voluntary consent is essential to every contract, and this is generally imported by the contract itself.

7. *Confidential relations; rule as to transactions between persons standing in.* But where the parties stand to each other in confidential relations, the contract does not of itself import consent. The burthen of proving the transaction fair and just, and the consent of him who sustains the detriment, and is subject to the influence, is upon the party who takes the benefit, and in whom the trust was reposed.

8. *Wife; transactions with, when she suffers loss and gains no benefit; how regarded in equity.*—Transactions with a wife, looking to the relief of a diseased husband, who is harassed in mind, and in dread of criminal prosecution, from which she suffers detriment, without deriving corresponding benefit, in which she parts with property, without receiving an adequate valuable consideration, the parties dealing with her having knowledge of her distressed condition, will be investigated vigilantly by courts of equity, and if there be any trace of undue influence from any source, or advantage taken of her condition, it will undo them.

9. *Same; same.*—Fraud need not be shown, in such case, but if the wife acted hastily, without time and opportunity for deliberation, in the absence of disinterested advice, and without opportunity to obtain it, or, if she was acting under the influence of the fear of punishment of her husband, or of extreme terror, or, of apprehension of his impending death, and her motive was his relief, a court of equity must intervene and restore her to the condition in which she was, when induced into the transaction.

10. *Husband's debts; when payment of by wife will not be disturbed.*—When it is shown that there was no haste, no want of deliberation on the part of the wife, no threat of prosecuting her husband criminally, but that she had the advice of friends (although she knew her husband's creditors were acting with the advice of counsel), and that her avowed purpose in transferring a policy of insurance on the life of her husband in payment of his debts, was to save the good name of her husband and children, the law cannot condemn the fair and intelligent exercise of such a motive, and the transfer will not be disturbed.

APPEAL from Mobile Chancery Court.

Heard before Hon. H. AUSTILL.

This was a bill in equity, filed by Annie D. Holt, wife of Geo. W. Holt, against G. W. Agnew, Duncan T. Parker, and W. A. Smith. All the facts of the case, so far as they are necessary to a correct report of it, are stated in the opinion of the court. On the hearing the Chancellor dismissed the bill, and his decree is assigned as error.

GREGORY L. SMITH, for appellant.—The life insurance policy in favor of appellant was her statutory separate estate, and, under the provisions of the Constitution, was not liable for any debts, obligations, or engagments of her husband. A married woman cannot, under the Constitution, mortgage or convey her statutory separate estate, in payment of her husband's debt. If any statute undertakes to permit her to do this it would be unconstitutional, for whatever shape the

[Holt v. Agnew et al.]

transaction is made to assume, if its purpose and effect is an appropriation of her statutory estate in payment of such debt, the transaction is void as to all persons not occupying the relation of *bona fide* purchaser for value and without notice.— *Weil Bros. v. Pope*, 53 Ala. 385 ; *Williams, Berney & Co. v. Bass*, 57 Ala. 487. A wife cannot pay her husband's debts by being first declared a "free dealer," and then appropriating her statutory separate estate to that purpose. The whole object of the constitutional provision would be destroyed by an act of the Legislature, which would permit it. A woman, however, is only declared a *feme sole* as to particular acts, and she is still under disability as to everything except as to the things mentioned. The payment of her husband's debts with her statutory estate is not mentioned, and she cannot, under the Constitution, be enabled to do so. The act of appellant, in transferring the insurance policy, was not free or voluntary. What was the motive ? Payment of her husband's debt, and the Constitution does not permit it. Appellant's motive was to prevent her dying husband from indictment, and the defendants knowing her motive took advantage of it. Here are dealings between a woman, and a husband dying from mental anxiety, coming to represent her rights, from weary, sleepless nights of watching over him who is dearest on earth to her ; distracted by his delirious visions of criminal prosecutions, with no friend to advise her, and three shrewd business men, aided by counsel. The transfer ought not to be permitted to stand, under the law and the facts. See 1 Story Eq. Jur. 133, 238, 339 ; *Whelan v. Whelan*, 3 Conn, 557 ; *Balkum v. Brear*, 48 Ala. 78 ; *Kennedy v. Marcus*, 45 Ala. ; *McCabe v. Hussey*, 2 D. & Clark, 440 ; 26 N. Y. 9.

JOHN LITTLE SMITH, for appellees.—The provisions of the Constitution of Alabama were not intended to fix the statutory estates of married women in mortmain. The language of Art. X, § 6, relates to all property which a married woman may acquire before or after marriage, as well by contract or purchase, as by inheritance, and it must therefore be applied to all alike. If it means that property, which a married woman took under a contract which expressly made it chargable, at her will, for the debts of her husband, should not be so charged, it would violate the provisions of the contract, and the Constitution of the United States. The language of the Constitution means the same thing that such language means, when we find it in deed settling property on married women, with a provision that such property shall not be liable for the debts, contracts, and engagements of the husband. It is well settled that she may charge the property

[Holt v. Agnew et al.]

· with her husband's debts, unless the deed contains some further limitations on her powers. The legislature can authorize her to charge such property as a married woman who holds her property with no other restrictive words than those mentioned.—*Robinson v. O'Neal*, 56 Ala. 541 ; *Short v. Battle*, 52 Ala. 456 ; *Halliday v. Jones*, 57 Ala. 527 ; 1 Bishop Mar. & Div. 797-8. The act of Feb. 10, 1875, was intended to authorize the Chancellor to make married women such free dealers as the legislature could have made them, is found in the fact that since the passage of the act, no bill can be introduced to make a married woman a free dealer, unless it be accompanied with a transcript of the record, from the proper Chancery Court, showing an application to the Chancellor for that purpose, his refusal and the reasons therefor. The act, therefore, covers all cases, and there is no limitation restraining their power to mortgage their property, to pay the debts of the husband. The statutory separate estate is given by statute and may be modified by statute.—57 Ala. 527. The proof shows, overwhelmingly, that the defendants were not guilty of any fraudulent practices. There was no relation of trust or confidence between the parties in this case, such as exist in cases cited by the appellant. The mere fact that the acts of complainant enured indirectly to the benefit of the defendants can not, and ought not to, force them to refund money which they did not receive.

BRICKELL, C. J.—It is certainly true that the motive of appellant in becoming a *"free dealer,"*·as it is termed, or rather in obtaining relief from the disabilities of coverture as to her statutory or other separate estate, through the decree of the Chancellor in pursuance of the statute (Code of 1876, § 2731), was the assignment of the policy of insurance taken in her name, on the life of her husband, to pay the debts of her husband. It is also true, the appellees aided her in obtaining the decree, with full knowledge of her motive, and to avail themselves of the assignment in discharging the obligation of the husband for which they were answerable as his sureties. The argument pressed by the counsel for the appellant is, that though she was by the decree of the Chancellor relieved from the disabilities of coverture, as to her statutory or other separate estate, and endowed with full capacity to *buy, sell, hold, convey and mortgage real and personal property, and to sue and be sued as a feme sole,* yet, she was without capacity to make any disposition of her estate in payment of the debts of her husband. The incapacity is supposed to result from the constitutional provision : "The real and personal property of any female in this State,

acquired before marriage, and all property, real and personal, to which she may afterwards be entitled by gift, grant, inheritance or devise, shall be and remain the separate estate and property of such female, and shall not be liable for any debts, obligations, and engagements of her husband, and may be devised or bequeathed by her, the same as if she were a *feme sole*."— Const. 1868, Art. 14, § 6; Const. 1875, Art. 10, § 6. Assuming the truth of the proposition, it is insisted the defendants, to whom the policy of insurance was assigned for the purpose of paying the debts of the husband, and who used it for that purpose, are liable as constructive trustees to respond to the appellant for the moneys realized from the assignment. The argument is not, however, sound—the foundation upon which it rests, that the constitution prohibits the wife from applying the estate it secures to her, to the debts, obligations, or engagements of her husband, can not be admitted. If the terms and words of the constitution, had at, and prior to, its adoption, been employed in a gift or conveyance to, or a settlement upon, a married woman, they would have created an equitable separate estate. The execution of liability of the estate for the debts of the husband would have been simply an expression of the implication of the law of an incident of the estate, and the negation of one of the conveyances resulting from coverture at common law, attaching to the estate held or acquired by the wife, to which the marital rights of the husband, as defined by the common law, attached. The constitution must be construed just as a conveyance or a gift in its terms would have been construed, at the time of its adoption. Constitutional provisions of this character, framed with the view and intended to remedy defects or evils in the common law, as it had existed in the State, must be construed and read in the light of that law. When words and terms are employed in such provisions, having by the common law a definite signification, and there is not an intention manifested to attach to them some other signification, it is more than presumption that they are used in their known and defined meaning and sense.—Cooley's Cons. Sim. 74; *Taylor v. Woods,* 52 Ala. 477; *Bender v. Meyer,* 55 Ala. 596.

By the common law, husband and wife were regarded as but one person, for many purposes. The legal existence of the wife was lost, or, as most often expressed, merged in that of the husband. She was without capacity to contract, and had not the administration of her property. By the marriage, if she was seized of an estate of inheritance, the husband became seized thereof, taking the rents and profits during their joint lives, and, by possibility, during his life.

[*Holt v. Agnew et al.*]

If she had an estate of freehold, not of inheritance, as for her own life, or the life of another person, the husband became seized of such estate, and entitled to the rents and profits during marriage. If the estate was *per autre vie,* the husband became a special occupant of the land during the life of such person. Her chattels real passed to the husband, who had power to sell, assign, or make other disposition of them, at pleasure. As to her choses in action, he had an unqualified right of reducing them to possession, and, thereby, acquiring absolute ownership of them. He could sue for, release, discharge, or assign them. If, without reducing them to possession, or altering their character, he died, his rights, springing out of, and dependent on, the marital relation, terminated with its dissolution. Of her personal property in possession, *eo instanti,* the marriage, title and possession passed to the husband. And personal property, title to, and possession of, which accrued to, or was acquired by, the wife, during the coverture, became the absolute property of the husband. Her possession was his possession, because, in the eye of the common law, she was positively incapable of a possession distinct from that of the husband. These were the property rights of the husband, as defined and declared by the common law, and when they were exercised, as a necessary incident of ownership, a liability of the property for the payment of his debts resulted. For twenty years before the present provision was introduced into the constitution, the statutes had enlarged the capacity of married women to take and hold property, and had abrogated the common law rights of the husband to the estate, real or personal, of the wife. The purpose of the constitution was the prevention by legislative enactment of a restoration of the common law, and the preservation of the enlarged capacity of the wife. Coverture does not now render her incapable of taking and holding. The capacity remains to her, in the words of the constitution, as if she were a *feme sole.* Title and ownership remaining to, and residing in her, the husband by marriage acquiring neither, nor a right to either, liability for the payment of his debts, an incident of ownership, would have been excluded, without the explicit declaration, found in the constitution, that it should not attach. It is the common law liability of the property of the wife, for the payment of the debts of the husband—a liability his creditors could enforce against the consent of the wife—to which the constitution refers.—*Bender v. Meyer*, 55 Ala. 576. It has no reference to the voluntary payment of the debts of the husband, as it has not to any other disposition the wife may make of the estate secured to her, freed from the com-

· [Holt v. Agnew et al.]

mon law rights of the husband, and freed from subjection to such rights by legislative enactment. All such dispositions depend for their validity upon the capacity of the wife, as the owner of the estate. There was no purpose to render it illegal for the wife to pay, or secure, the debts of the husband, if the powers conferred were large enough to embrace such a disposition of her estate. And it is quite an error to suppose that a policy is established which would be offended if the wife, from affection, or on any fair consideration, should relieve her husband from the pressure of debt.

Prior to the statutes, or to the constitutional provision, whenever an estate was by the terms of its creation limited to the sole and separate use of a married woman, whether a trustee to take and hold the legal title was interposed or not, the property rights of the husband at common law were excluded, an equitable estate was created. As to such estate, a court of equity regarded the wife as a *feme sole*, and she could in reference to it contract, alienate, or otherwise dispose of, or charge it, as if she were fully *sui juris.*—*Short v. Battle*, 52 Ala. 460 ; *Demarrest v. Wynkoop*, 3 Johns. Ch. 129. As we have said, by appropriate terms, the constitution creates an equitable separate estate, and if the statutes did not intervene, and narrow and circumscribe the capacity of the wife to contract, and to alienate or charge it, and attach to it peculiar incidents and properties, over it she could exercise the same power which she could have exercised over an equitable separate estate.—*Hooper v. Smith*, 23 Ala. 639. The statutes intervene, and disable her from charging, or alienating it, in the payment of the husband's debts, or from mortgaging or assigning, or selling it, to secure, or to pay any debt, or demand, whatever. They limit her power to a sale and conveyance, in which the husband must join, and which must be in writing, attested by witnesses, or, acknowledged before an officer having authority to take and certify the acknowledgment of conveyances. The statutes also commit the estate to the care of the husband, as trustee, and authorize him to take the rents and profits without liability to account for them. These limitations upon the capacity of the wife, embarrassing the alienation of the estate, are found sometimes operating to lessen its value to her, and to render it of but little advantage in the maintenance of herself and family. From many causes the husband, without fault on his part, may become unsuitable as trustee to manage it, or it may not be safe that the rents and profits should pass into his possession. Whenever he becomes incapable of, and unfit for the discreet management and control of the estate, the statutes confer on the wife the right to obtain a decree

[Holt v. Agnew et al.]

from the court of chancery for his removal from the trustee-ship, and when such a decree is obtained, another trustee is not interposed, but the wife has the same power and control over the estate, that she would have, if she were a *feme sole.* (Code of 1876, §§ 2717–18). · She may then mortgage or charge it as security for her own debt, or for the debt of the husband.—*Bell v. Locke,* 57 Ala. 242.

The statutes go further, and authorize the Chancellor, on application of the wife, to relieve her from the disabilities of coverture as to her statutory, or other separate estate, and empowering her to buy, sell, hold, convey and mortgage real and personal property, and to sue and be sued as a *feme sole.* The words of the statute are plain and unambiguous, and the power of disposition conferred on the wife is very broad when she is relieved of the disabilities of coverture ; there is no exclusion of her power to mortgage, or to assign, her estate to secure the payment of the debts of the husband. The power to mortgage, to sell, or otherwise transfer, is general and unlimited, and there can be no reason for engrafting an exception of mortgages, or transfers of any kind, to secure the debts of the husband. The exception would be repugnant to, and inconsistent with the terms of the statute. Passing upon a private statute, enabling a married woman to receive and hold property by gift, purchase, or inheritance, as a *feme sole,* this court, in *Perryman v. Greer,* 39 Ala. 133, declared there was no doubt of her capacity to mortgage such estate as security for the debt of the husband. The appellant had full capacity, after being relieved of the disabilities of coverture by the decree of the Chancellor, to assign, or to sell, the policy of insurance, in the payment of her husband's debts. It must, however, be observed that the statute does not confer on the wife, a general or unlimited power of contracting. It is only her capacity to buy, sell, hold, convey, and mortgage, which is enlarged.

It is insisted that although the appellant may have been *sui juris,* of full capacity to assign and sell the policy of insurance, yet it is shown that advantage was taken of the distressing circumstances by which she was surrounded to press her into the transaction, when she was without the aid of the advice of counsel, or of disinterested friends, and without opportunity to procure it, the appellees having the benefit of the advice of counsel, which they were pursuing. The capacity, the right to dispose of property at will and pleasure, is an incident of its ownership, which the law recognizes, and neither courts of law, nor of equity, can assume to control it, or to annul dispositions, because they may be esteemed injudicious, unwise, or improvident, or because they may not be

[Holt v. Agnew et al.]

such as a prudent man would make, or a just, generous, and honorable man would consent to receive. Consent, free and voluntary, is, however, an essential element of every contract and of every disposition of property. The contract, or the disposition, whatever may be its form, or character, generally, of itself, imports consent, and is sufficient evidence of it. There are relations in life, in which influence is acquired by the one party, and confidence reposed by the other—relations of which we usually speak as *confidential,* that open the way and afford opportunity for impositions, or undue influence, and yet, rather close the door to, and render difficult, the detection of its exercise. Such are the known relations of trustee, and *cestui que trust,* guardian and ward, attorney and client, principal and agent, husband and wife, but the number or character of the relations are not defined by law; " all the variety of relations in which dominion may be exercised by one person over another," fall within the general term *confidential relations.* When, in such relation, the party subject to imposition, to undue influence, enters into a contract with, or makes a disposition of property to the other, from which detriment is sustained by the one, and benefit derived by the other, upon principles of public policy, there is no presumption of consent; the act or contract does not of itself import it. The law casts the burthen of proving the transaction fair and just, and the free consent of him who sustains the detriment, and is subject to the influence, upon the party who takes the benefit, and in whom trust was reposed.—*Johnson v. Johnson,* 5 Ala. 90; *Juzan v. Toulmin,* 9 Ala. 684; *Lowery v. Ferguson,* 54 Ala. 510; *Malone v. Kelly, ib.* 532; *Dickinson v. Bradford,* 59 Ala. 581; *Lanier v. Waddell,* 62 Ala. 347. In all these cases, it is a very material and important circumstance, which may relieve the transaction of much of the suspicion attaching to it, and tend to show the spontaneity of the *cestui que trust,* if he had full opportunity to obtain, and in fact did obtain competent and independent advice in reference to the transaction from counsel, or from disinterested friends, who were bound to him, and not subject to the influence of the trustee.—Kerr on Fraud, 151; *Malone v. Kelly,* 54 Ala. 546. On the other hand, if the *cestui que trust* has not such advice, and the trustee has it, and is acting upon it, the fact is as material and important, and it may be safely said, the transaction can but seldom stand vigorous judicial investigation.—*Kempson v. Ashbee,* R. 10 Ch. App. 19; *Baker v. Bradley,* 7 DeG. Mc. & G. 621; *Clarkson v. Hanaway,* 2 P. Wm. 205; *Coffman v. Lookout Bank,* (Sup. Ct. Tennessee); Southern Law Journal, April, 1881, 275.

[Holt v. Agnew et al.]

In this case, it cannot be said there was any relation of trust and confidence existing between the parties. To the fidelity and integrity of the appellees, the appellant did not commit her interest, nor did she look to them for advice or protection. They met, and by her own act and upon her own suggestion, they were invited into the relation of parties contracting with her, that she might obtain relief for her husband, afflicted by disease, harassed in mind because of the official default, from which he apprehended the most serious and extremest consequences. Transactions with her looking to the relief of her husband, from which she sustains detriment, and does not derive corresponding benefit, in which she parts with property, or rights of property, and does not obtain an adequate, valuable consideration, in view of her distressed condition, which was known to the appellees, the plainest considerations, and highest obligations of right and justice, compel a court of equity to investigate jealously and vigilantly, and to undo them, if there be any traces of undue influence from any source, or of advantage taken of her condition. Fraud or imposition may not be shown—of either the parties may be fully acquitted, yet. if she has acted hastily, without time and opportunity for deliberation, in the absence of disinterested advice, and without opportunity to obtain it, or if she was acting under the influence of threats of the punishment of her husband, or of extreme terror, or of apprehension of his impending death, and her motive was his relief, a court of equity must intervene, and restore her to the condition in which she was, when induced into the transaction. The doctrine upon which the courts act, when a party, by the force of circumstances, is reduced to a condition in which he cannot deal upon terms of equality with another, and is peculiarly subject to oppression, or imposition, or to undue influence, is thus expressed by Judge Story : " As, where he does an act, or makes a contract, when he is under duress, or the influence of extreme terror, or of threats, or of apprehension short of duress. For, in cases of this sort, he has no free will, but stands *in vinculis*, and the constant rule in equity is, that, where a party is not a free agent, and is not equal to protecting himself, the court will protect him." * * * " On this account courts of equity watch with extreme jealousy, all contracts made by a party while under imprisonment; and, if there is the slightest ground to suspect oppression in such cases, they will set the contracts aside. Circumstances, also, of extreme necessity and distress of the party, although not accompanied by any direct restraint or duress, may, in like manner, so overcome his free agency as to justify the court in setting

(24)

aside a contract made by him, on account of some oppression, or fraudulent advantage, or imposition, attendant upon it."—1 Story Eq. § 239. And so in cases of surprise, of sudden action without due deliberation, if there is great inequality of consideration in the transaction, and advantage is taken of the circumstances which mislead, confuse or disturb the reason and judgment, the court will intervene.—1 Story Eq. § 251. In all this class of cases it must be borne in mind that the distressed or necessitous condition of the party does not deprive him of the capacity to contract or of the capacity to dispose of his property in mere benevolence and generosity. Incapability would add to, and aggravate, rather than mitigate his misfortunes. Nor is the fact that in the light of subsequent events he may decree his transactions improvident, or that he does not obtain from them the anticipated benefits, or he suffers disappointment from any cause not traceable to the party with whom he deals, a ground or reason for setting them aside. All that can be said is, the circumstances excite the jealousy and vigilance of a court of equity, and when to them is added improvidence in the transaction, the court will interfere if there be traces of fraud, of undue advantage, or of surprise.—*Nall v. Boyer*, 30 Penn. St. 99 ; *Green v. Thompson*, 2 Fred. Eq. 365.

The facts of this case, as we collect them from the evidence are, that the husband of appellant had been, and was the secretary of an insurance company, having the custody of its funds, and the appellees were sureties on his official bond, answerable for his defaults. In August, 1875, his health failed, and continued to decline until his death in January, 1876.

In October, he ceased to attend to his duties as secretary, and was thereafter confined to his room. From the first of his illness, he manifested frequent terror and alarm, starting from fright in his sleep, which was nearly always restless and disturbed. His whole conduct at home, with his family, indicated that he was laboring under the constant apprehension of some impending evil, or misfortune, and of course the appellant was deeply distressed because of his condition. Soon after he was confined to his room, he confessed to the appellant that he was a defaulter to the insurance company in a large sum, probably seven or eight thousand dollars, and expressed fears that the company would prosecute him criminally. This added to her grief, and after consultation, they sent for his relative, William B. Holt, to whom he communicated the fact of his default, and from whom he requested assistance to satisfy it. The appellant was present at the interview, and voluntarily expressed her willingness to give

[Holt v. Agnew et al.]

up everything she possessed to make good her husband's default. At a second interview, William B. Holt informed the husband that he could not aid him in paying the default, and advised him to send for his sureties, and disclose the facts to them, as they were then uninformed of them. Smith, one of the sureties, was sent for and was informed of the default. No harshness, no threats, were indulged in by Smith, and so far as is shown, not an unkind expression. Without the presence of her husband, voluntarily, the appellant begged Smith to assist in relieving him, expressing a willingness to give up everything they possessed, for his relief. The appellee, Parker, was by Smith informed of the default, and visited the husband at his instance. To him, as to Smith, the fact of the default and its probable amount was communicated. The interview was in the presence of the appellant, and though Parker had not spoken of, or demanded indemnity or security, the appellant again voluntarily expressed a willingness to give up everything for the relief of the husband. In answer to an enquiry from the husband, if he was liable to a criminal prosecution, Parker answered, that he believed the insurance company would be satisfied if the money was paid.

The next day Parker, at the request of the husband, again visited him, and during the interview, which was in the presence of the appellant, the proposition was made by the husband to turn over to his sureties sundry notes, a policy of insurance in his own name, on his life, issued by the Mobile Life Insurance Company; and the policy of insurance, (now the matter of controversy), issued to the appellant on his life, for four thousand dollars, by the Alabama Gold Life Insurance Company. The husband explained to the appellant that this policy was payable to and could be assigned by her only, and she expressed her willingness to make the assignment, without being solicited or persuaded by Parker, and in the absence of any expression of an apprehension of the criminal prosecution of her husband, by him, or by her, or any allusion to such a prosecution. The policies were delivered to Parker, and he procured his attorneys to endorse on them the proper assignments, which were executed a few days thereafter, in the presence of Parker and William B. Holt, and after full explanation to the appellant that she had the property in and the sole power of disposing of the policy payable to her. Afterwards, Parker was informed by his attorneys, that it was doubtful whether the assignment made of the policy by appellant and her husband, would pass title to it, and suggested that if she was willing to be made a *free dealer*, she could then, in her own name, make a valid assign-

[Holt v. Agnew et al.]

ment. The appellant, upon being informed of these facts, consented to make application to be relieved of the disabilities of coverture, and at her request, William B. Holt became, and acted as, her next friend in the proceedings for that purpose. He read to her the petition, explained fully its nature, and that the motive was to enable her to make a better and more effectual assignment of the policy of insurance. After being relieved of the disabilities of coverture, she executed a new assignment of the policy in the presence of a notary public, after it was read to her. This assignment was executed in the presence of Parker and the husband. A sale of the policy to the Gold Life Insurance Company was then negotiated, but they declined concluding it with any one but the appellant. She visited the office of the company, attended by the appellee, Agnew, to consummate the sale, and in his absence, had an interview with the president and attorney of the company. The attorney was very prudent and careful, in inquiring if she was making the sale from fear, compulsion, or undue influence, from any source; or from the fear that a criminal prosecution would be commenced against her husband, if his default was not satisfied; all of which she disavowed. She avowed that she was acting freely to save the good name of her husband and their children. When reminded that if her husband recovered, his health would probably be so impaired that he could not obtain another insurance on his life, declaring Parker and Agnew had been her husband's best friends, and very kind to him, she said the policy really belonged to them, for it would have lapsed if they had not paid the last premium. The sale was made, the money paid to her, and she was advised not to part with it, but to keep it for the support of herself and children. Six weeks or more elapsed after the first suggestion of an assignment of the policy of insurance before the sale and payment of the money to the appellees, by whom it was applied in payment of the husband's default.

With some minuteness we have detailed the facts as we collect them from the evidence, because all cases of this kind depend essentially upon their own peculiar circumstances. As is to be expected, there is some conflict in the evidence; but the facts stated, we regard as fully proved, and reject as disproved, other facts of which there may be some evidence.

It is obvious there was no haste, no want of deliberation upon the part of the appellant in this transaction, nor was there the want of opportunity to consult counsel if she had desired. Nor was there the absence of the advice of disinterested friends. The relation of her husband, William B. Holt, to whom they gave the first information of the hus-

[Holt v. Agnew et al.]

band's default, and in whom they reposed confidence, was cognizant of all the circumstances, and acting as her next friend in the prosecution of her application to be made a *free dealer*, was in some degree, a participant in the transaction.

He was not under the influence of the appellees, was without any motive to promote specially their interests, and had every motive to guard and protect the rights and interests of the appellant. To her, he was bound by the ties of relationship, and by the confidence and trust in him, which she and her husband clearly manifested. While it is not expressly shown that in words he advised the transaction, it is apparent that it had full sanction and approval, and his conduct was the equivalent of the most unqualified advice in words. Nor was there any misconception, or mistake of facts, or of her rights by the appellant. At all times, it was fully explained to her, that the policy belonged to her, and she alone had capacity to dispose of it. Nor was there importunity or persuasion on the part of the appellees. Upon her own suggestion, springing from her love of her husband, she from the first information of his distressed pecuniary condition, avowed her willingness to yield everything for his relief. Nor was she uninformed that the appellees had, and were acting with the advice of counsel, and that all the proceedings which were taken were intended to enable her to make a valid effectual assignment of the policy of insurance.

There was no imprisonment, no threat of it, nor of the criminal prosecution of the husband. The apprehension of prosecution, or of imprisonment, was one of the terrors vexing and harassing him, but it seems to have possessed him only, and when in the presence of the attorney and president of the insurance company, the appellant had every motive to speak freely and candidly, she disavowed being influenced by any such apprehension, or by any fear or compulsion. Then she avowed what we cannot, in view of all the evidence doubt, was her real controlling motive, the desire and purpose to relieve her husband, and as far as possible the preservation untarnished, of his good name, alone influenced her. Such a motive will influence the wife, and we cannot say the law disapproves or condemns its fair, intelligent, spontaneous gratification. All the courts can do, is to be vigilant and jealous in guarding and protecting her from all abuse of the confidence her relation compels, and from all practices upon her affections by the more calculating, or the more wary, or more artful. When her confidence is not abused ; when no advantage is taken of her condition when she acts intelligently and spontaneously, free from all circumvention, having full capacity, her executed contracts cannot be undone by

any court.—*DeRange v. Elliott*, (8 C. E. Green) 23 N. J. Eq. 486.

We have examined the evidence in this cause again and again, and after most patient consideration, and with an anxious solicitude to guard and protect the appellant, we cannot find proofs which would justify us in undoing the transaction, and compelling the appellees to restore her the money with which she voluntarily, and intelligently parted. These observations dispose of the case, and the decree of the Chancellor is affirmed.