# Lee *v.* Lee.

*Bill in Equity for Settlement of Guardian's Account.*

1. *What not a solvent condition of a banking institution ; notice to directors ; loan.*—An insurance company engaged in a general banking and insurance business, having a capital of $100,000, of which $70,000 is loaned out on mortgages of real estate of the same (but no greater) nominal value, cannot be considered in a healthy or prosperous condition ; and its directors being chargeable with a knowledge of its condition, when they are sought to be charged with the loss of trust funds borrowed from a guardian, on whose bond they are sureties, cannot claim to have acted in ignorance.

2. *Character of guardian ; abuse of trust.*—In the grant of letters of guardianship for an infant, the interest of the ward, the safety of his funds, and the character of the guardian for integrity and sound judgment, are the considerations that should influence the court ; and it is an abuse of the trust to appoint a person of known insolvency, who is instigated to apply for letters by the officers of the insurance company, they becoming sureties on his bond, and he lending the infant's funds to the company without security.

3. *Same ; settlement, expense.*—When a guardian resigns and makes a settlement of his accounts, the expense of the proceeding falls on the ward ; and the statutes do not contemplate the appointment of a person who has agreed with one of his sureties, in advance of his appointment, to resign and settle his accounts at the expiration of one year, in order that the surety may be discharged; this is an abuse of trust.

4. *Same ; re-appointment.*—When a guardian settles his accounts, and resigns, at the same time applying for a re-appointment as his own successor with different sureties on his bond, this should excite the vigilance of the court, and the appointment should be refused without a sufficient explanation of the unusual circumstances.

5. *Sureties; liability.*—The guardian having loaned the trust funds of his wards to an insurance company, whose directors had become sureties on his official bond, on his agreement to lend the funds to their company, no security being given or required for the loan, it is immaterial whether this was a stipulation of the original agreement ; nor can the directors, in avoidance of their personal liability as sureties, shelter themselves behind a formal compliance with the requisitions of the statute (Code, § 2773), because two persons of known insolvency signed their names as sureties for the loan.

6. *Guardian and ward ; sureties on bond.*—A guardian cannot, during the minority of his ward, file his accounts for final settlement, make a settlement with a *guardian ad litem*, and resign ; such settlement being unauthorized, it neither discharges the sureties on his bond, nor binds the ward.

7. *Same.*—On such settlement and resignation, the guardian being immediately re-appointed, and giving bond with the same sureties (except one, who sought thereby to be discharged), the exhibition and tender to him of the money which he had loaned the insurance company, and which he had promised in advance not to accept, does not amount to a payment in fact, nor affect the rights and liabilities of the parties.

8. *Doctrine of retainer ; bond, election, ward.*—In such a case the doctrine of retainer and presumed extinguishment, growing out of the dual relation of

[Lee v. Lee.]

debtor and creditor existing in the same person does not apply; the sureties on the first bond are not discharged, but the ward may, at his election, proceed against the sureties on either bond.

9.  *Sureties; bill, amendment.*—The bill being filed against the sureties on both bonds, and alleging that all participated in the proceedings connected with the resignation and re-appointment of the guardian, for the purpose of procuring the release and discharge of the single surety on the first bond who did not sign the second bond, and at the same time enabling the insurance company to retain the money, it was held on the former appeal (*Lee v Lee*, 55 Ala. 590), that the bill was not multifurious.  But the evidence failing to sustain the allegations of the bill as to the participation of the released surety in the covinous combination and conspiracy established against the others, the complainants are entitled to no relief against him ; but being entitled to substantial relief, they should be allowed an opportunity to amend their bill.

10.  *Breach of official duty ; trustees in invitum.*—When a guardian lends out the money of his ward without security, he is guilty of a breach of official duty, and the borrower, if cognizant of this breach of duty, becomes a trustee of the money *in invitum* ; and the ward may, at his election, hold them accountable as joint and several trustees.

11  *Partial payment ; collateral.*—In such a case a partial payment made by the borrower, operates as a partial payment made by the guardian ; and a mortgage, or other collateral security, given by the borrower to the guardian and enforced by the ward, operates only as a partial payment, and does not amount to a ratification of the guardian's unlawful act.

APPEAL from Perry Chancery Court.

Heard before Hon. ANTHONY DILLARD.

The bill in this case was filed on 22d December, 1875, by John Lee, Edgar Lee and Mary Lee, the latter two being infants and suing by their next friend, the said John Lee, against their guardian, John H. Lee, and the several sureties on his official bonds as such guardian, to-wit :  F. A. Bates, W. B. Modawell, J. H. Speed, J. W. Crenshaw, A. B. Lane, W. M. Brooks, W. C. Wyatt, Harriet Johnston, W. R. Brown, A. M. Foulkes, Carlos Reese, J. B. Cocke, and Amzi Godden ; and was brought for the purpose of compelling a settlement of the guardian's accounts, and the payment into court of the money found due the complainants on a statement of the guardianship accounts.  The complainants, together with David Lee, an infant of tender years, who died on the 13th of November, 1872, were the only children and heirs at law of John Lee, late of Perry county, who there died intestate, during the year 1870, being possessed of a large estate, real and personal ; and letters of administration on his estate were duly granted soon after his death, to Porter King.  On the 27th February, 1872, letters of guardianship on the estate of said four children were granted by the Probate Court of Perry county to John H. Lee, one of the defendants ; and he thereupon gave bond as such guardian, in the sum of one hundred thousand dollars, with the defendants, F. A. Bates, W. B. Modawell, J. W. Crenshaw, J. W. Speed, A. B. Lane, W. C. Wyatt, and W. M. Brooks, as his sureties.  On the 5th March, 1872, he received from the admin-

[Lee v. Lee.]

istrator of John Lee's estate, the sum of seven thousand and eight dollars in gold, and twenty-three thousand seven hundred and ninety-two dollars in currency, belonging to the estates of his said wards, and on the 25th January, 1873, he returned an inventory to the court, under oath, acknowledging his receipt of these moneys on that day. On the 28th of January, 1873, he filed with the court his accounts and vouchers for a final settlement of his guardianship, showing the following balances in his hands due his wards : To John Lee, eighteen hundred and forty-four 86-100 dollars in gold, and four thousand nine hundred and fifty–eight 09-100 dollars in currency ; to David Lee, then deceased, eighteen hundred and forty-four 86-100 dollars in gold, and five thousand four hundred and nineteen 35-100 dollars in currency ; to Mary Lee, the same amount in gold, and four thousand two hundred and eighty-seven 48-100 dollars in currency. The court thereupon appointed the 5th day of March, 1873, following as the time for the settlement ; and ordered three weeks notice of it to be given. On the 5th of March, 1873, the court appointed T. A. Givhan as guardian *ad litem* of the infants, and he accepted the appointment in writing, certifying on the accounts, as filed, that he had examined them and found them correct, and consented that they be allowed as stated ; and the court thereupon allowed the accounts as stated, and rendered decrees against the guardian, in favor of each of the complainants for the amounts thus shown to be due each of them respectively, including the amount found due the estate of David Lee. The decree further recites that the guardian has resigned, accepts his resignation, and orders that he be discharged from the further performance of his duties as such guardian. On the same day the said John H. Lee again applied for letters of guardianship on complainant's estates, and letters were again granted to him ; and he thereupon gave another bond, which was accepted by the court in the sum of sixty thousand dollars, with F. A. Bates, W. C. Wyatt, W. R. Brown, A. B. Lane, W. M. Brooks, W. B. Modawell, J. H. Speed, A. M. Fowlkes, Carlos Reese, J. B. Coke, Amzi Godden, and Mrs. Harriet Lee, (the mother of complainants, who afterwards married again, and was made party defendant to the bill by the name of Harriet Johnson), as his sureties. On the 9th day of April, 1873, the guardian filed in said court as an inventory of his ward's estates, a statement under oath that he had collected from the Perry Insurance and Trust Company the sum of seven thousand three hundred and seventy 44-100 dollars in gold, and the further sum of twenty thousand two hundred and seventeen 17-100 dollars in currency; being the aggregate amount

[Lee v. Lee.]

of said decrees rendered against him on the 5th of March, as above stated, and had again loaned the same to said company for twelve months, at eight per cent. interest, with W. B. Modawell and W. R. Brown as sureties for the loan ; and he asked that satisfaction of the decrees might be entered.

The bill alleges that John H. Lee was insolvent at the time of his first appointment as guardian, and so continued up to the time of the filing of the bill, and was known by his sureties to be insolvent when they signed his bond ; that it was understood between him and them, at and before the execution of the bond, that he would lend the money belonging to his wards to the said Perry Insurance and Trust Company, of which said W. R. Brown was then the president, and F. A. Bates, J. W. Crenshaw and W. M. Brooks, directors ; that on the 5th of March, 1872, pursuant to this agreement, he loaned all the moneys which he had received to said insurance company, without taking or requiring any security for the loan ; that said company was at that time greatly embarrassed, and in doubtful circumstances, and its condition was well known to its directors ; that on the 28th of January, 1873, the said company was in failing circumstances and unable to pay its debts, and had not repaid any of the money borrowed from said guardian ; that said J. W. Crenshaw, knowing these facts, threatened to make application to the Probate Court to be released from liability on said guardian's bond ; that thereupon it was planned between said Crenshaw, Brown, Bates, and other officers of said company, that he should settle his accounts, resign his guardianship, make application to be re-appointed, give a new bond, and acknowledge satisfaction of any decree that might be rendered against him ; that this plan was contrived for the purpose of releasing said Crenshaw from liability on said guardian's bond, without the payment of any money, and without calling upon the said Insurance company for any money, and it was carried into effect and consummated as shown by the proceedings in the Probate Court ; that said guardian made application for his re-appointment for the purpose of carrying out this agreement, and did not collect any money from said insurance company as he reported to the Probate Court he had done on the 9th of April, 1873 ; that W. B. Modawell and W. R. Brown, whom he had reported he had taken as sureties for the new loan, were at that time insolvent ; that the said insurance company had become insolvent, had ceased to do business, and its assets had been placed in the hands of a receiver ; that the guardian had thereby become unable to furnish the infant complainants with means of subsistence and education, and their property was in danger of

[Lee v. Lee.]

being entirely lost; and they insisted that all the sureties on the two bonds were liable to them for the moneys which their guardian had received. The bill prayed that an account might be stated, to ascertain the amount due to the complainants respectively from the said guardian; that he and his sureties might be required to pay to the adult complainant, John Lee, the amount ascertained to be due him; that the amounts ascertained to be due to the infant complainants respectively might be paid over to a receiver, or some suitable person to be appointed by the court, and applied for their support and maintenance, and for other and further relief.

The defendants filed separate answers to this bill, admitting substantially the execution of the bond, and that at the time of its execution it was understood that the moneys belonging to the complainants should be loaned to the Perry Insurance and Trust Company. They alleged that Porter King, the administrator of the estate of the father of complainants, had kept the moneys belonging to said estate on deposit with the Perry Insurance and Trust Company, and that when a final settlement of Lee's estate was made, King had given John H. Lee, the guardian, an order on said company for the amount of the distributive shares of the complainants and their deceased brother, David Lee; that the amount of these shares was as the bill alleged; that by agreement between the guardian, Lee, and the Perry Insurance and Trust Company, the order of King, the administrator, was taken up by the said company, and the money retained by it as a loan; that Lee, the guardian, did not in fact take the money from the company and re-deliver it as a loan, but that it was left in the possession of the company; that owing to the entire confidence of the guardian and his sureties in the solvency of the company, the question of taking security for this loan was never thought of. The answers deny that at the time of such loan the Perry Insurance and Trust Company was largely in debt, and embarrassed with law-suits, or that all of its capital stock had been lent out to persons who were largely insolvent, or in doubtful and failing circumstances. The answers admit the final settlement of Lee, the guardian, and his resignation, but deny that at this time the Perry Insurance and Trust Company was in failing circumstances, but aver that it was perfectly solvent and enjoyed the trust and confidence of the community at large. The defendant, Crenshaw, denied that he ever threatened to apply to the Probate Court to be relieved from the guardian's bond, and while admitting that he wished to be discharged from said bond, this wish was in no

manner attributable to any distrust of the solvency of said
Perry Insurance and Trust Company. The answers all deny
any such plan as that charged in the bill, concocted between
Lee, the guardian, and any of the other defendants, that said
Lee should settle his guardianship and apply to the court to
be again appointed guardian of complainants, and give a new
bond and acknowledge satisfaction of the balance found to
be due on such settlement, for the purpose and with the in-
tent of releasing Crenshaw from liability on said bond. The
answers further show that after the re-appointment of Lee as
guardian of complainants, he came to a settlement with the
Perry Insurance and Trust Company in regard to the moneys
of his ward, loaned to said company, and after ascertaining
the balance due him as such guardian, he agreed that the
company might retain the money as a loan for twelve months,
and the company executed its promissory note therefor.
That Lee, in the inventory he filed in court under oath,
showed his disposition of such moneys; that upon the appli-
cation of the guardian the Probate Court approved of his
said report and ordered the same recorded; that John H.
Lee did not seek a re-appointment as guardian of complain-
ants by reason of any such scheme or plan as that set out in
the bill, but was induced to do so by the entreaties of Mrs.
Harriet Lee (now Johnston), the mother of complainants;
that John H. Lee is not indebted to the complainants in the
sums mentioned in the bill, or in any part thereof. It was
further alleged that the father of complainants had great
faith in the Perry Insurance and Trust Company; that he
was a Director of the same, and was in the habit of lending
his money to that institution; that his administrator, Porter
King, fully concurred in these views, and deposited the
moneys of Lee's estate with said company as long as he was
such administrator, and also his own individual moneys.
The defendant, Crenshaw, alleged in his answer, that while
very loath to go on the guardianship bond of John Lee, it
being contrary to his rule to do so, he nevertheless consented
to become, and did become, one of the sureties on such bond,
upon the representation of said guardian that he would lend
the moneys of his wards, the complainants, to the Perry In-
surance and Trust Company, in which respondent, Crenshaw,
had great faith, as being sound financially. Crenshaw also
alleges that if the money belonging to the complainants had
been lost by their guardian by reason of his lending the same
to said Insurance and Trust Company, it had been lost since
the resignation of said guardian, after his re-appointment and
after Crenshaw had been released from all liability on his
said bond. The answers of the defendants further aver that

the allegation in the bill that by reason of said moneys being lent to the Perry Insurance and Trust Company it was in great danger of being lost, was untrue, but that, on the contrary, every dollar of said moneys could be collected. All the respondents admit that it was one of the conditions of their becoming such guardian's sureties, that the moneys of the wards should be loaned to the Perry Insurance and Trust Company. John H. Lee, the guardian, also makes this admission. They all deny that they knew of John H. Lee's insolvency at the time they signed his bond as guardian, and John H. Lee denies that he then knew himself to be insolvent. Said Lee admits that he was largely indebted at that time, but avers that this indebtedness arose from the purchase of property to which he then believed he had obtained good titles. He admits, however, that owing to after discovered defects in his title to said property, and various security debts, he was at said time, and is now, insolvent. Lee and Crenshaw both allege that the agreement of the latter to go on Lee's bond was for one year only, and that it was for this reason, and this reason only, that the resignation and re-appointment was had. John H. Lee further alleges, that though having full trust and confidence in the solvency of the Perry Insurance and Trust Company, he did in 1875 inform that company that he must have some additional security for his wards' money, and accordingly said company transferred to him a deed of trust upon two plantations containing about twenty-seven hundred and eighty acres, more or less, of land situated in Perry county.

Mrs. Harriet Johnston filed her answer to the bill, admitting substantially the averments thereof, and also a crossbill against John H. Lee, and the sureties on his guardianship bond, praying, in substance, the same relief as that asked for in original bill.

Demurrers were interposed to the bill, but as these were considered and disposed of by this court in the case of *Lee v. Lee*, 55 Ala. 590, it is unnecessary to state them here.

The testimony in the case shows that the guardian, John H. Lee, was insolvent; that the Perry Insurance and Trust Company held a mortgage upon his entire property; that the law day fixed in said mortgage had passed; that the stockholders and officers of said company proposed and suggested to said John H. Lee, that he should become the guardian of complainants; that they agreed and promised to make his bond as such guardian, provided he would allow the funds of his wards to remain in the hands of the said company; that said guardian consented to this condition, and that said bond was made for the purpose of enabling the Perry Insurance

[Lee v. Lee.]

and Trust Company to retain and use the funds of the complainants. The testimony of John H. Lee, W. R. Brown, F. A. Bates and John W. Crenshaw, establish these facts. It is further shown by the evidence that the sureties of John H. Lee on his first bond were stockholders and officers in said company; that these sureties sought out John H. Lee, and proposed and suggested to him that he should become the guardian of the complainants; that they agreed and promised that they would make his bond for him upon condition that he would suffer the money of his wards to be retained by the Perry Insurance and Trust Company; that the bond was made upon this agreement and understanding; that the sureties on such bond were induced to procure John H. Lee to be appointed guardian, and to make his bond for him solely to promote the interest of the Perry Insurance and Trust Company, and especially to obtain the moneys of complainants by a loan—said moneys being then in the possession of said company as a special and temporary deposit; that said Lee did loan the funds of his wards as agreed upon, without good and sufficient security. W. R. Brown, the president of the company, in his answer to the direct interrogatory, testified as follows: " Perceiving the injury that might result to the company . . . . I, for one, thought best to get some person to be appointed guardian of the children, and certain stockholders and directors of the company consented to furnish the requisite security for John H. Lee, if he would become the guardian and lend the money to the company for one year." It was further shown by the said Brown's testimony that the money was loaned under a previous agreement between John H. Lee and his sureties, that he would lend said money to said company. The whole testimony shows that this understanding was well known before the first bond was executed, and by the sureties signing the same. It clearly appears that the sureties on the first bond of the guardian, Lee, were all stockholders, and some of them, directors of said Insurance and Trust Company, had originated and carried into effect the appointment of John H. Lee as guardian of complainants. It also appears that no outside security was asked or offered, and that the securities of the guardian did not wish any indemnity from the said company. It was was further shown by the evidence that the Perry Insurance Company, with a capital of only about one hundred thousand dollars, had at the time of Lee, the guardian's loan to it, loaned out about seventy thousand dollars on mortgages of real estate of no greater nominal value. It was also shown that John H. Lee, or some one for him, procured from the Probate Judge of Perry county, several

days before Lee's final settlement, a blank bond in order that he might procure sureties to the same for his re-appointment. The final settlement, the resignation, and re-appointment of Lee, are shown to have been accomplished on the same day, and the second bond was also given on the same day. These and the other material facts are stated in the opinion. The court decreed that the complainants, and the cross-complainant, were entitled to the relief prayed for ; that the final settlement, resignation, and re-appointment of John H. Lee, the guardian of complainants, was absolutely null and void for want of jurisdiction in the Probate Court acting upon the same ; that there never had been any payment by the Perry Insurance and Trust Company, to John H. Lee, of the moneys belonging to complainants ; that there was no security such as by law required, given by the Perry Insurance Company for the loan of such money ; that such loan was a *devastavit* committed by the guardian, Lee, and that the sureties on his first bond were bound to make good to the complainants any loss resulting from such unauthorized loan by the guardian, Lee, to the Perry Insurance and Trust Company. It was further decreed that John H. Lee should settle his guardianship in the Chancery Court, and said Lee was decreed to file his accounts and vouchers for a final settlement before the register, who was directed, in stating such account, to act conformably to the terms of the decree as above set forth. The decree of the Chancellor upon the law and facts, are here assigned as error.

W. M. BROOKS, and JNO. F. VARY, for appellants.

JAMES W. LAPSLEY, and PETTUS, DAWSON & TILLMAN, for appellees.

STONE, J.—The capital stock of the Perry Insurance and Trust Company was one hundred thousand dollars, one-half of which, $50,000, was paid in. For the remaining fifty per cent. the notes of the stockholders were taken. The business of the corporation was taking fire risks, and a general banking and exchange business. The company commenced business, and in about three years had substantially paid up the residue of the stock, $50,000, in dividends declared. So that, in fact, only $50,000 of the capital stock was paid in. In what we are stating, we are governed by what we understand to be the testimony of the officers in charge of the corporation. The principal business of the company was banking. We feel authorized to find from the testimony that by, or soon after the year 1869, three or four years after the com-

VOL. LXVII.

pany had commenced business, the bank had out near or quite sixty thousand dollars of its money, in the hands of three or four persons. Twenty-five thousand dollars of this sum was out on a loan to John H. Lee, on mortgage of two plantations and their stock and equipments, which the witnesses testify were worth twenty-five thousand dollars. None of them place the value above that sum. Another loan of sixteen thousand dollars was secured by mortgage on a plantation, testified to be worth eight thousand dollars. A third loan or investment of a sum between sixteen and twenty thousand dollars, was also resting on the security of a plantation, not claimed to have been worth more than twenty-five thousand dollars. Now, it is common knowledge that lands put up at a forced, cash sale, rarely, if ever, bring their value. They do not generally sell for half their estimated value. That these lands were not convertible into money at the face value of the debts they were pledged to secure, is shown in the fact that in 1872, and even later, they had not been converted into money. Even when the company made an assignment and failed in 1875, one of these loans of twenty-five thousand dollars remained unsettled. A second claim of nearly or quite equal amount had not been realized upon in 1873, and the securities therefor were sold to Woodruff for about one-half they called for. The testimony does not inform us of the subsequent history or fate of the loan of sixteen thousand dollars. Add to these complications the fact that the company had a banking house worth ten thousand dollars, and we have a grand total of seventy per cent. of the capital stock invested in suspended, non-convertible securities and assets. However much the directory may have believed the corporation solvent and sound—and we cannot doubt they did—yet, viewed as a bank, we cannot think it was in a healthy and prosperous condition in March, 1872. And persons familiar with its condition and operations, as directors attending its meetings should have kept themselves, should have known that too much of its cash capital was invested in non-convertible securities. We are aware that men are ordinarily unduly hopeful. Bank directors are but men, and have common human infirmities. To this, in part, we ascribe the confidence the officers and directors had in their corporation in 1872, and in 1873. We do not think the bank was in a prosperous condition during either of those years. Mr. Crenshaw was one of the original stockholders, became a director in 1868, and continued such until the corporation failed in 1875. He is not shown to have been unfamiliar with the operations of the bank, and knowing the

facts, he must, if necessary, be charged with knowledge that the banking operations had been imprudently conducted.

There are circumstances connected with Mr. Lee's appointment and continuance as guardian, which we feel it our duty to refer to. The infant children of John Lee, deceased, were about to have distributed to them thirty thousand dollars in money. John H. Lee, cousin of decedent, though shown to be an honest, upright man, was insolvent, and his insolvency was known to the directors and owners of the Perry Insurance and Trust Company. His chief indebtedness was to that corporation. It is not shown that he desired or asked to be appointed guardian, or that the oldest child, who must have been over fourteen years old, or the mother of the children, originated the thought of his becoming guardian. The thing was first suggested by persons in the interest of the Perry Insurance and Trust Company; and when Mr. Lee expressed an inability to make the bond, he was informed the company would make it for him. It is manifest from the whole proceedings that one of the conditions on which the company made the bond was, that he should lend the money to the company. If such had not been the understanding, he could not have made the bond he did; and we have no doubt if he had withdrawn the money from the bank, after either of his appointments, the sureties would at once have ceased to be longer bound for him, and he would have ceased to be guardian. Now, whether this loan was to be made with or without security, these were not proper considerations to enter into the selection or appointment of a guardian. A guardian for an infant should be selected for his good character, sound judgment, prudence, and adaptedness to the trust. He must safely keep the funds, and, at the same time, make them productive. The safety of the funds, and the interest of his ward, should be the sole guiding principle in the administration of his trust. In these functions he should be free and untrammeled. If he be under obligations, previously assumed, to make a particular disposition of the funds; in other words, if he be not entirely free to place the loan where it will be safest, most productive, and most readily reduced again to possession, then the personal disinterestedness of the trust is impaired, and his fiduciary relation is liable to become warped by his personal interest, or social obligation, if not by a more controlling exigency. However the pre-arrangement may have been regarded in the present case, the tendency of such bargains is antagonistic to the policy of our statutes, and must divide and weaken the severe loyalty the guardian owes his ward. He should always keep

[Lee v. Lee.]

himself free to deal with a proposed borrower at arm's length.

Another subject for criticism. In the effort to relieve Mr. Crenshaw of all participation in the second appointment, the execution of the second bond, and the renewal of the loan to the Perry Insurance and Trust Company, it has been sedulously sought to show that one of the conditions on which he, Crenshaw, consented to become, and did become, a bondsman in the first appointment, was, that he, Crenshaw, should remain bound only one year, and at the end of that time, Lee should settle his guardianship, account for the funds, and then release Crenshaw. Now, the resignation of a guardian, the making of a final settlement, and taking out new letters, each entails expense, rendered necessary only by the resignation, and that expense falls on the estate of the ward. True, under a statute of 1871, a guardian may resign his trust.—Code of 1876, § 2768. It was never contemplated, however, by the legislature, that a guardian should be appointed with a foregone determination to resign at the end of a year, and during the minority of the ward.

We have commented on these peculiarities, if not irregularities, attending these guardianships, with no intention of making them the basis of our decree. Our purpose has been to call attention to them, to characterize them as abuses, and, if possible, of preventing this peculiarly delicate and responsible relation of guardian from being perverted to the purposes of merchandise. We trust no probate judge would make the appointment of a guardian, if he knew that one of the conditions on which he could make his bond was, that he should commit the custody and administration of the ward's estate to another, either natural or artificial, person ; or, if he knew the trust was to be retained for only a short period, less than the term of the ward's minority. We take a step farther. If an administrator or guardian resign, and, at the same time, apply for re-appointment as his own successor, and offer a new bond with sureties changed, this should awaken inquiry in the .breast of the probate judge ; and, *prima facie*, he should refuse to make the second appointment. We do not design these remarks to apply specially to this case, more than to any other similarly circumstanced.

A great deal of testimony has been taken to prove that, when Lee was first appointed guardian, there was no prior agreement that the money of the wards should be lent to the Perry Insurance and Trust Company, *without security*. As matter of fact, we think there is a failure to prove such prearrangement. It is not denied, however, that it was previ-

ously agreed that the money should be lent to the corporation ; and we think we may safely affirm that without such agreement, Lee could not have procured the sureties he did, and could not have made an acceptable bond. There is, on the other hand, no testimony that, in the previous negotiations, any thing was said about securities, and it is very certain that when the loan came to be made, none were required. True, two names were indorsed on the written contract, but the proof is, that these indorsers signed their names without request from any one, and both were confessedly insolvent when they so indorsed. We can not regard these indorsements as a compliance with the statute, or as furnishing any security whatever.—Code of 1876, § 2773. The guardian did lend the money without security, and this rendered him and his sureties liable therefor, no matter how solvent the insurance and trust company may have been at that time. He violated a positive statutory duty, and this fastened the liability.—*Lee v. Lee*, 55 Ala. 590, 598.

Having shown that the guardian, by lending the money without security, fastened a liability on himself and sureties, the question is, have the sureties on the first bond who were not on the second, been discharged ? The loan was made March 5th, 1872, and the liability then attached. Has it been cancelled ?

In January, 1873, Lee, the guardian, filed his account current and vouchers for a final settlement of his guardianship, pursuant to the agreement he made with Crenshaw. Proper order was made, notice by advertisement given, and on the 5th day of March the accounts were audited, the balances ascertained, and decrees were rendered against him for the several sums ascertained to be due his wards respectively. No objection is urged to the formal regularity of these proceedings. In point of fact, Lee was guardian when he filed his account current, and continued so until the day of settlement, March 5th, 1873, when he resigned. He took all the steps necessary to a settlement, if he did not make the settlement itself, before he resigned. · The record does not inform us whether the settlement or resignation was first in point of time ; but does inform us that both took place March 5th, 1873. A guardian *ad litem* had been appointed to represent the minors in the settlement, and the decrees were rendered in his favor for the use of the several minors. There is no statute authorizing a guardian to settle his accounts finally, while he remains in office. He can settle when the ward comes of age, or, if a female, when she marries, or when his authority as guardian ceases by removal, &c.—Code of 1876, § 2772. There are other provisions for coercive settle-

ments, but they do not apply to this case.—Code, §§ 2791-2. The settlement being set on foot and made when the Probate Court had no authority or jurisdiction in the premises, it stands for nothing, and may be collaterally assailed, or treated as a nullity.—*Lewis v. Allred*, 57 Ala. 628. Until the term of the guardianship had ceased by the majority of the ward, or, by a cessation of the guardian's authority, the Probate Court had no jurisdiction to take any steps looking to a final settlement. This case must be treated, then, as if no attempt had been made to settle in March, 1873.

It is contended for Crenshaw, that he is entirely discharged from liability : *First*. Because, after Lee had resigned his first guardianship, had been re-appointed, and had qualified under that appointment, the Perry Insurance and Trust Company actually paid to him the money it had borrowed from him, that he then re-lent the money to the company, and reported to the Probate Court that he had collected the several decrees rendered against him in the former guardianship. We can not agree to the proposition that what took place on the 5th March, 1873, amounted to a payment in fact. True, the money was shown to Mr. Lee, and we have no doubt it was the correct amount. He was also informed that there was his money, and he was requested to count it. This, however, was but an empty form. He had previously agreed not to take the money from the company, and on the strength of that agreement, the officers and stockholders of the coporation had made his second bond for him. If he had taken the money, he would have violated his agreement, and we have no doubt his sureties would have refused to be longer bound for him. The law regards the substance of things, not their semblance. There was no payment in fact.

It is contended, in the second place, that inasmuch as Mr. Lee, by his second appointment, became his own successor— thus centering in himself the authority to demand, and the duty to pay—the law, from the necessity of the case, presumes a payment of the claim to the creditor estate. This, because the law furnishes him no coercive measures for collecting the demand, and because it was his duty under the second appointment, to possess himself of the assets of his ward. We need not, and do not, in this case, decide what would be the rule, if Lee had made a valid settlement of the guardianship, and the decree of the court thereon, had fixed and determined authoritatively, the extent of liability of the first to the second guardianship. That is not this case. We have shown above that the attempt to make a settlement was a nullity, because the statutory jurisdiction did not attach. The case then stands in law, as if the amount due from the

first to the second guardianship was unascertained. In such cases, we hold that the wards are clothed with an election, to charge the sureties on the first bond, for the unauthorized loan of the money by the guardian, without security; or, they may proceed against the sureties on the second bond, for the failure of their principal to obtain a proper decree of the court, and transfer the assets to the second guardianship. The case is directly within the principle declared in *Whitworth v. Oliver*, 39 Ala. 283. See *Morrow v. Peyton*, 8 Leigh. 54; *Aylett v. King*, 11 Leigh. 486; *Flinn v. Carter*, 59 Ala. 364.

There was a demurrer in the court below for multifariousness. The multifariousness charged was; that the bill makes both sets of the sureties defendants, and seeks a joint recovery against them for the funds improperly lent to the insurance and banking company, under the circumstances disclosed above. The Chancellor sustained the demurrer for multifariousness, and the complainants appealed to this court.—*Lee v. Lee*, 55 Ala. 590. We reversed the ruling of the Chancellor, holding that on the face of the bill it was not multifarious. Among the averments of the bill, which we decided was not multifarious on its face, we copy as follows: "That before and on the 28th day of January, 1873, [the time when the accounts current were filed to make final settlement of the first guardianship], the Perry Insurance and Trust Company was in failing circumstances, and unable to pay its debts, which was then well known to said J. W. Crenshaw," and the other sureties on Lee's first guardian bond; "that said J. W. Crenshaw, well knowing the failing condition of said Perry Insurance and Trust Company, and that it was unable to pay its debts, and well knowing that said company was indebted to John H. Lee as guardian, as aforesaid, on account of the money so loaned, in a sum of more than twenty-seven thousand dollars, and well knowing that said John H. Lee was insolvent, threatened to make application to the Probate Court to be released from the bond of said John H. Lee as guardian, as aforesaid: thereupon, it was planned between said J. W. Crenshaw and said W. R. Brown, then president of said Perry Insurance and Trust Company, said Francis A. Bates, and the other officers of said company, and said John H. Lee, that said John H. Lee should settle his said guardianship in the Probate Court, and resign his said guardianship, and then apply to be re-appointed guardian of your orators and oratrix, and give a new bond, and acknowledge satisfaction of the balances which should be found against him on such settlement; that this arrangement was contrived and planned, for the purpose and with the intent

to release the said J. W. Crenshaw from liability on the said guardian bond, as the surety of said John H. Lee, without the payment of any money." The bill then avers that all these plans were carried out with the concurrence of said J. W. Crenshaw, W. R. Brown, and F. A. Bates, and other officers of said company, and that it was done "for the purpose and with the intent on the part of said John H. Lee, J. W. Crenshaw, W. R. Brown, and other officers of said company, to carry out the plan so contrived to release said J. W. Crenshaw from his said liability, without the payment of any money ; and then prevent any call being made on the Perry Insurance and Trust Company for the payment of the money so borrowed from John H. Lee, as aforesaid." Treating these averments as true, as it was our duty to do on demurrer, they make a very clear and strong case of covinous combination and conspiracy to defraud the complainants. The only name found on the first bond that is not on the second, is that of J. W. Crenshaw. Hence, he alone is interested in having the first set of sureties discharged. It will be seen in the averments copied, that he is charged with full knowledge, and with active participation in all that was unlawfully planned and executed to the prejudice of complainants. The charges made, if true, fix on him a liability, common with the other bondsmen. On these grounds, and these alone, was the bill in this cause relieved of the charge of multifariousness.—*Lee v. Lee*, 55 Ala. 590. The case is now before us on the testimony. We have shown above that in March, 1872, and in March, 1873, the Perry Insurance and Trust Company, as a banking institution, was not in a prosperous condition. It is not shown it was insolvent, or that Crenshaw knew or believed it was in failing circumstances. On the contrary, the testimony shows that he, the other directors, and the stockholders, believed the corporation to be solvent and sound at each of those dates. There is not only no testimony connecting Crenshaw with the design, plan and combination charged, to have Lee re-appointed, to have him execute a new bond, and thus release Crenshaw, without requiring the company to pay the money, but the testimony is uniform, strong, and convincing, that he, Crenshaw, had nothing to do with procuring the second appointment, the execution of the second bond, or the continuance of the loan to the company. The testimony is, that he did not even know there was a plan or wish to have Lee re-appointed. He desired to be released from the bond, expected Lee's guardianship to cease, and expected the money to be paid. The testimony is, that the company had set apart the money with which to make the payment, and, at one time, expected

[Lee v. Lee.]

to pay it.   There was a purpose subsequently formed to have
Lee re-appointed, and thus retain the money in the bank,
but there was no proof connecting Crenshaw with this newly
formed purpose, or showing he had knowledge of it.   The
combination and conspiracy charged upon Crenshaw, with
others, which, on demurrer, relieved the bill of the imputation
of multifariousness, is thus shown to have failed in the proof.
In the only aspect in which the unities of the bill can be
maintained, the complainants must fail for want of proof.
The testimony fails to show a common liability resting on
Crenshaw and the new sureties on the second bond.   We
have shown above that each set of sureties is liable, but there
is no common liability.   It presents a case for election by
the wards, against which set of sureties they will proceed.
This objection arises on the evidence, which fails to sustain
one phase of the bill, still it shows complainants are entitled
to substantial relief, and they are entitled to an opportunity
to amend.—Code of 1876, § 3790; *Smith v. Coleman*, 59
Ala. 260.

The bill in the present case was filed December 22d, 1875.
In 1876 John H. Lee, by mortgage, conveyed to the Perry
Insurance and Trust Company, two plantations, to secure the
payment of a debt he owed the company for money advanced
for him, amounting to twenty-five thousand dollars.   This
debt remained uncollected, and in March, 1875, when the af-
fairs of the corporation were becoming desperate, this mort-
gage and the debt it secured were transferred and assigned
by the company to John H. Lee, guardian, as collateral secu-
rity of the said loan, so made by Lee, guardian, to the com-
pany.   It was stipulated in the assignment that the mort-
gage should not be purchased until after three years from
the assignment.   In July, 1878, the present complainants,
wards of said John H. Lee, filed their bill to foreclose this
mortgage, claiming the proceeds to be realized, in part pay-
ment of the said sum due them from their guardian.   The
defendants in this suit plead this, and rely on it as a ratifica-
tion of the illegal and unauthorized loan made by the guard-
ian, and as a bar to any further complaint by the wards
that their moneys had been lent without security.   When
Lee, the guardian, lent the money of his wards to the Perry
Insurance and Trust Company without security, he commit-
ted a *devastavit*—a breach of his statutory, official duty.
*May v. Duke*, 61 Ala. 53.   The Perry Insurance and Trust
Company, when they then borrowed the money, knew it was
the property of his wards, and must be charged with knowl-
edge that in the loan the guardian violated his statutory
duty.   The company aided him in this breach of duty, and
Vol. lxvii.

[Lee v. Lee.]

became recipients of the money by and through that breach of duty. This constituted them trustees of the funds *in invitum,* with all the duties and disabilities of the rightful trustee and guardian, Lee, resting upon them, but, without the powers and rights of the latter. Thus making themselves trustees *in invitum,* it is in the power of the beneficiaries to charge this trust upon the company, and make it an original debtor to them, in common with their lawful guardian and rightful trustee. The company and Lee are joint and several trustees of this fund, and liable to account as such to the beneficiaries, if the latter elect to so treat them.—2 Story Eq. Ju. § 1257; Perry on Trusts, §§ 832, 835, 836, 840, 841, 810, 814; *Preston v. McMillan,* 58 Ala. 84; *Graft v. Carthman,* 16 Amer. Dec. 741; *Coleman v. Cocke,* 18 Ala. 757; *Powell v. Jones,* 1 Ired Eq. 337.

It being thus shown that the Perry Insurance and Trust Company had made complainants claim its original debt, in common with Lee, the guardian, it follows that any partial payment made, or security given by it, is no more a bar to further suit against it, or against Lee and his sureties, than if Lee himself had made partial payment, or given collateral security.

But aside from the principle stated above, we do not think there is anything in the alleged ratification that can prejudice the present complainants. Suing as they do, they are no more estopped than they would be, if Lee, their guardian, having collected a part of the money from the company, the wards accepted it from him, with a knowledge of the source from which it came ; or, than Lee himself would be, if suing the insurance and banking company for the money. The suit to forclose the mortgage does not exonerate Lee from liability for his *devastavit* and default, and his sureties are as much bound therefor as he himself is.—2 Story Eq. Ju. § 1092 ; *Harris v. Harrison,* 78 N. C. 202 ; *Powell v. Jones, supra* ; *Alexander v. Doby,* Rice Eq. (*S. C.*) 23.

The Chancellor granted relief on the cross bill. The view we take of the case would seem to leave no ground for that bill to rest on. We will simply reverse his decree on the cross-bill, and leave it for disposition in the court below, after the pleadings shall have been amended.

The decree of the Chancellor is reversed, and the cause remanded.

[NOTE BY THE REPORTER.—At a subsequent day of the term the appellants applied for a re-hearing, upon which the court rendered the following opinion.]

STONE, J.—It has been again pressed upon us with great zeal and earnestness, that the wards, complainants in this suit, by claiming the benefit and security of the mortgage of Lee, their guardian, to the Insurance and Trust Company, which was subsequently transferred by the latter back to Lee as security, of the loan to the company, must be regarded as having thereby ratified and adopted as legal, the loan made to the company. In other words, the principle is invoked, that if A, without authority, convert the money or property of B, into other property, and B, with knowledge, assert his ownership of the property into which his own effects had been converted, this is a ratification of A's unauthorized act, and equally absolves A from liability for the conversion, and the person to whom he had delivered B's effects from liability to account therefor. The principle is, that ratification, with full knowledge, is the equivalent of prior authority. In holding, as we did in the principal opinion, that the Insurance and Trust Company had made itself a trustee *in invitum*, and thereby became a principal debtor, we thought, and still think we showed the inquiry propounded above was, and is immaterial. Being a principal debtor, partial payment or partial security absolves no one, except *pro tanto*, any more than partial payment or security given by a joint obligor, will absolve his co-obligor.

But that principle has no application to this case. This is not the case of a conversion of trust funds by the trustee into something else, leaving the beneficiary the right and privilege of claiming the thing converted, or the thing into which it is converted.

The law, in such case, justly says he may claim either, but shall not have both. In the present case the breach of trust was committed in March, 1872, by lending the money to the insurance company without security. The money was not converted into anything, which the beneficiaries did or could claim. Three years afterwards, the Insurance and Trust Company turned the mortgage security over to Lee the guardian, as collateral security to the debt the corporation owed to him as guardian. In equity, every one interested in the collection of the debt the insurance company owed, had the right to claim that the proceeds of that collateral security should be applied towards the liquidation of the original liability. The beneficiaries—wards—the sureties of Lee, the guardian, and the Perry Insurance and Trust Company, each and all had the right to have the collateral made available for their common benefit. See *Thames v. Herbert*, 61 Ala. 340.

Nor is there anything in the argument, that by asserting claim to the collateral security, the complainants (wards) weak-

ened or impaired any right Crenshaw, as surety of Lee, could assert. His right, as surety was, to stand on the terms of the contract his principal, John H. Lee, had, by his bond, made with the complainants. It was his equitable right to have every security Lee, his principal, had acquired, utilized in his own exoneration. The complainants, the wards, had the same right, and their suit to foreclose was but an assertion of that right. If they, by their own act, or, possibly by their negligence, had deprived Crenshaw of the benefit of that fund, a contention by him that they had thereby discharged him, would be much better supported by reason and authority than the position he now takes. If he suffered the Lees, complainants, to acquire the mortgage property at a sum below its value, that was his own error or fault.

The application for a re-hearing must be denied.