# Desribes *v.* Wilmer.

## *Application to Probate Court for Appointment of Guardian for Minors.*

1. *Testamentary appointment of guardian; when instrument effectual as.*—An instrument to be effectual as a testamentary appointment of a guardian for minors, must show who is to have the care and nurture of such minors, although the word "guardian" need not be employed.

2. *Same; when instrument does not operate as.*—An instrument executed by a father of two minor children, reciting that he was lying in danger of death, and that he had "found kind friends to take charge [of] and raise" his children, and requesting the managers of an asylum, in whose custody the children then were, to place them "in the custody of" a party therein named, shows that it was not the father's intention for such party to have the care, protection and nurture of such children; and such instrument can not, therefore, be construed as a testamentary appointment of such party as guardian of said children.

3. *An instrument testamentary in its character must be probated.*—An instrument testamentary in its character can not be recognized as valid in any form, until it has been admitted to probate.

4. *Appointment of guardian; when erroneous.*—A probate judge has no authority to appoint a guardian for minors, for the purpose of having them sent into a foreign country; and an appointment made upon an application, which shows that such is the purpose for which it was sought, is improvident and erroneous, and should be revoked.

5. *Judgments; power of court over, during term at which rendered.*—The judgments of courts are in the breast of the judge, until the final adjournment of the term, and they may be set aside or modified at any time during the term at which they were rendered; and, unless the court in such order violate some rule of law, or pronounce a judgment the law will condemn, it is not error that such ruling was made without notice to the opposite party.

6. *Revocation of letters of guardianship; when notice unnecessary.*—An order revoking an erroneous and improvident appointment of guardian for minors, made during the same term at which the appointment was made, but on a different day of the term, is free from error, although it was made without notice to the party whose letters were thereby revoked.

APPEAL from Mobile Circuit Court.

(Name of the presiding judge not disclosed by the record.)

Charles Corege died in Mobile, in this State, in October, 1880, leaving two children, both of whom were then under twelve years of age, and whom their mother, the wife of Corege, had

[Desribes v. Wilmer.]

abandoned in their lifetime. The proceedings in this cause originated in an application made by Joseph Desribes, the appellant, to the Probate Court of Mobile County, to be appointed the guardian of said children. On final hearing the court entered a decree refusing to appoint him, and from this decree he appealed to the Circuit Court of said county. The Circuit Court affirmed the decree of the Probate Court, and from this judgment of affirmance, Joseph Desribes appealed to this court, and here assigned the same as error. The proceedings had in the Probate Court are sufficiently set out in the opinion.

HENRY ST. PAUL, H. C. SEMPLE and D. S. TROY, for appellant.

P. HAMILTON and JAMES BOND, *contra.*

STONE, J.—We enter upon the discussion of the questions raised by this record with deep feelings of regret; regret, that the case has been brought before us, and deeper regret that any occasion should have arisen for its presentation. It is history, that differences in religious faith and creed have given rise to the most inveterate and sanguinary quarrels the world has witnessed. "Vengeance is mine," is the language of inspiration, but mistaken duty and misdirected zeal have often prompted the fanatical to usurp this divine authority. Religious quarrels or persecutions find no warrant, or even palliating excuse, in our constitutions and jurisprudence. All religions, save such as shock the public morals, or offend our statutes, are alike tolerated and protected by the broad philanthropy of our republican policy. Our theory is to "render unto Cæsar the things that are Cæsar's, and unto God the things that are God's." We disturb no man's faith, unless it is made manifest in acts which violate municipal regulation. We deal with the physical and secular, and not with the mere moral which is not uttered in voice or act, offensive to our legislative policy. We have indulged in these general reflections, for the purpose of making more emphatic the declaration, that what may be considered the religious aspects of the present contention, can receive no consideration at our hands. We must deal with the case upon its dry legal bearings, as if it presented no question of religious differences; in other words, as if the rival claimants were of one religious faith. We are but a tribunal for the enforcement of municipal law, one of whose fundamental maxims is, "that no preference shall be given by law to any religious sect, society, denomination or mode of worship; . . . . that no religious test shall be required as a qualification to any office or public trust under this State; and that the civil rights, privileges and

capacities of any citizen shall not be in any manner affected by his religious principles."—Declaration of Rights, § 4.

Moral and theological problems are often of most difficult solution. The broadest philosophy is unconsciously warped by one's own creed. We say one's own, because by adopting it, we furnish the highest evidence that our conscience approves it. Yet, another, having equal advantages and equal intelligence, will condemn it as sincerely as we advocate it. Who is right, and who shall judge between us? This precise liberty of conscience—this right to differ with our fellow-men—our constitution not only tolerates, but guarantees to every man. Hence it is, that questions of polemic theology can never obtain a standing in our courts of judicature. Hence it is, that the religious aspects of this case must be entirely ignored by us.

What we have said above has been prompted in part by the fervid language of the counsel of appellant. What are claimed as "the still more precious rights of conscience," the baptism "in the church to which he [Chas. Corege] on his death-bed acknowledged spiritual allegiance," the assertion that "the main issue raised, is as to the religious training of the children"; these and many other similar expressions, we must confess, we find no warrant for in the record; and, we again say, in the form here presented, they can exert no influence in our deliberations. It is our purpose to censure no one, while at the same time, we feel it our duty to dissever the contention from all supposed sectarian bearings. Viewed from a legal standpoint, they can not be factors in our deliberations.

There is a social aspect of this question, upon which we feel authorized to express an opinion. We do not doubt the Church Home is a well founded and well governed asylum for the orphan and the destitute. We do not doubt that the children, over whom the present controversy arose, are as well and tenderly cared for, as they could be in any institution of eleemosynary foundation. We do not doubt their moral, religious, industrial and social training will be excellent. We do not doubt all will be well with them, during their stay in the Home. How will it be when the time comes for them to leave the asylum, and enter upon the battle of life? Just entering upon womanhood, pennyless, in a land where they can claim no blood relationship, who shall bear up such frail things amid rude and unsympathizing surroundings? Contrast with this picture the home and environments of an honorable and respected ancestry, the feeling of loyal attachment for an ancient family which descends from sire to son, and above all the sympathy and sustaining force which blood relationship always feels and exerts, and who could hesitate in choosing, when religious predilection is kept out of view? For myself, I think it would have been

better for the children, all things considered, if they had been restored to their "kinsmen according to the flesh." But the social bearings of the question are not for us. 'In the primary court, other things being substantially equal, we will not say that moral and social bearings and surroundings should be overlooked, in making the selection.

In the selection of a guardian, the interest, safety and wellbeing of the infant ward, are matters of prime, paramount consideration.—*Lee v. Lee*, 67 Ala. 406. Infants—particularly doubly orphaned, destitute infants—are, or should be wards of society, if not of government. Their protection and proper training are alike the instinct and mandate of an enlightened humanity. No sordid greed of lucre, no unchastened spirit of propagandism, should shade or pollute its benevolent purposes. The best attainable good of the infant should be the great, dominating principle; not the provisional benefit, but the lasting good.

How does the present case stand on questions of dry law? It is contended for appellant, that he is entitled to the guardianship of the children, because Charles Corege, the father, appointed him to be such. Testamentary guardianship was created in England by statute, 12 Charles II, and consequently was unknown to the common law.—1 Black. Com. 462 ; Schoul. Dom. Rel. 393. Section 2751 of the Code of 1876 provides, that "guardians may be appointed by the last will and testament of the father, if the right is claimed within six months after the will is admitted to probate." The paper relied on as conferring the right to guardianship in the present case, is in the following language: "State of Alabama, Mobile City. With grateful acknowledgment of the kindness to my two minor children, named Louise Adele Corege, 10 years old, and Emma Heloise Corege, 9 years old, by the managers of the Protestant Orphan Asylum, but being myself lying in danger of death at the City Hospital in this city, and having found kind friends to take charge and raise my said children, I respectfully request the managers of the Protestant Orphan Asylum of this city to place my said children in the custody of Rev. Father Joseph Desribes of this place. In witness whereof, I have hereunto set my hand at Mobile, Oct. 5, 1880. [Signed] Chas. Corege."

This instrument had two subscribing witnesses, and on the same day, a notary public of Mobile certified to its acknowledgment before him, adopting the form prescribed for the acknowledgment of deeds.—§ 2158 of the Code of 1876. It was not probated as a will. There are two unanswerable objections to the position here assumed. An instrument testamentary in its character can not be recognized as valid in any form, until

it has been admitted to probate.—2 Brick. Dig. 532, § 105. But if probated, this instrument can not be construed as appointing Rev. Joseph Desribes to be guardian. It not only fails to indicate that he was to have the care, protection and nurture of the children, but, by clear implication, shows the contrary. Unnamed kind friends were to take care of, and raise the children. The instrument, to be effectual as a testamentary appointment, must show who is to have their care and nurture, but the word guardian need not be employed.—*Gaines v. Spann*, 2 Brock. 81; *Wardwell v. Wardwell*, 9 Allen, 518; *Corrigan v. Kiernan*, 1 Bradf. Sur. 208; *Miller v. Harris*, 14 Sim. 540.

It is further contended for appellant, that the Probate Court appointed him guardian, rightfully so appointed him, and had no authority under the circumstances to revoke the appointment. The application for the appointment was made by appellant, March 5th, 1881. The principal ground on which the appointment was claimed, was the writing signed Charles Corege, copied above. The court thereupon made an order, setting the case for hearing on the 17th March. On the 17th March, the court made this order:

"State of Alabama,　）　Probate Court of said County, March
　Mobile County.　　 ｛　17, 1881.

Louise A. Corege, Emma H. Corege, minors. In matter of guardianship:

It is ordered, that the consideration of the application for letters of guardianship over the persons and estates of said minors be continued to the 30th inst.

　　　　　　　　　　　　P. Williams, Jr. Judge.

No reason is shown anywhere in the record why this order of continuance was made.

On the next day, March 18, an *ex parte* application was made to the probate judge to make the apppointment, and he proceeded to make it. The reasons urged for the haste, were, that it was desired and intended to send the children immediately to their paternal aunt in France, who had agreed to receive and care for them, that the Vice Consul of France, resident at Mobile, would provide them passage on a French vessel then lying in port, that said vessel was then receiving its freight for the return voyage, and the consequent danger of losing this favorable opportunity of restoring the children to their father's relations. On the 30th March, Rev. R. H. Wilmer, rector of the Church Home, having the custody of the children, appeared and petitioned the Probate Court to revoke the letters of guardianship granted to Rev. Joseph Desribes, as improvidently granted; setting forth that he had had no notice of the application, that he had been absent on clerical duties, that the children had been placed in the Home with the written consent and appro--

[Desribes v. Wilmer.]

bation of their father, and he claimed their rightful custody. Thereupon the Probate Court, without notice to the appellant, made an order setting aside his appointment as guardian, and ordering that the further hearing of said application be set down for 6th day of April.

The record in this case leaves it somewhat obscure as to the day on which the further hearing of said application was had. The day appointed for such hearing, as we have seen, was April 6th. This was Wednesday, five days before the regular April term of the court, which occurred on the 11th, the second Monday. The final order made in the cause begins as follows: "This being the day to which the hearing of the petition of Rev. Joseph Desribes for letters of guardianship of the persons of said infants [Louise Adele and Emma Heloise Corege] had been postponed" etc. This order is dated in the caption, "Probate Court, April 16th, 1881." This was Saturday, and there is no order in the record postponing it to that day. In the bond for appeal from the Probate to the Circuit Court, it is recited that the decree appealed from was rendered on the 11th April. This could not have been true, if the trial was entered upon on the 16th. On the other hand, this recital is very reasonable, if the trial was begun on the 6th, the day appointed; for there was a good deal of testimony, and doubtless a great deal of feeling in the cause; and a delay of the decision for five days, until the 11th, would not be unusual. We therefore infer, that the trial was commenced on the 6th and protracted to the 11th; and that the date in the transcript—April 16—is an error of the copyist. A further reason for this construction: In the final order it is said, the 18th day of March—the day on which the order was made appointing Rev. Joseph Desribes guardian—was "a day of this term of this court." This could be true, if this final hearing was begun and had on the 6th, or at any time before the 11th. A term of the Probate Court can be kept open by adjournments or continuances, up to the last judicial day before the next succeeding term. The second Monday in March, 1881, was the 14th day of the month. On that day the March [regular] term of the Probate Court commenced. It could be kept open until Saturday, the 9th day of April, the last judicial day before the second Monday, 11th day of April. The conclusion we reach is, that the trial was commenced on the 6th, a day to which the March term was adjourned, progressed with, and that on the 11th the decree, (possibly held up for deliberation,) was pronounced. This harmonizes all the averments and recitals in the record, except the single one of the date, April 16, which we conclude must be a mistake.

"Guardians must be appointed for minors under the age of

[Desribes v. Wilmer.]

twenty-one years, by the judge of probate of the county in which such minor resides."—Code of 1876, § 2748. The domicil of the father at the time of his death, is the domicil of his infant child. No one, not even the mother of such child, can, of his or her mere volition, change the inherited domicil of such child.—*Johnson v. Copeland*, 35 Ala. 521. We have hinted above at the duties the guardian owes to the ward. To the person of the ward he is placed in *loco parentis*. Protection, nurture, and a proper care of the moral training of the infant are among the duties the law casts upon him. If the infant ward own property, the law casts other duties on the guardian, not necessary to be here noticed. Now, all these statutory provisions, and the whole theory on which guardians are appointed under our laws, proceed on the postulate, that the relation is to be kept up, and the ward retained within the jurisdiction in which the guardian is appointed. True, a guardianship once rightfully taken out may be removed to another State; but to this end, certain statutory regulations must be strictly followed.—Code of 1876, §§ 2796, 2800; *Lary v. Craig*, 30 Ala. 631. The statutes make no provision for such removal to a foreign country. But we need not pursue this inquiry, as the present record raises no such question.

The appointment of appellant, as we have seen, was made March 18. It was shown in the application to the probate judge, that the object for which the appointment was sought, was not that the applicant should become and continue guardian of the infants in the county of Mobile, or in the State of Alabama. The avowed, express purpose was to send them immediately to a foreign country. The probate judge had no authority to appoint a guardian for such purpose, and he consequently erred in making the appointment. It was his duty to revoke such improvident appointment, and he did not err in doing so.—*Jones v. Brooks*, 30 Ala. 588. The order of revocation being granted during the same term at which the appointment was made, although on a different day, no question of notice can arise. The judgments of courts are in the breast of the judge until the final adjournment of the term, and may be set aside or modified during the term; and unless the court in such order violate some rule of law, or pronounce a judgment the law will condemn, it is no error that such ruling was made without notice to the opposite party. An order improperly granted, should be set aside, if the error be discovered during the term; and, if necessary, we would presume counsel continued present in the court, until the order of revocation was passed. We might present other arguments in vindication of the ruling in the court below, but deem them unnecessary.

Affirmed.